UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

KIERAN O'HARA,                          )
        Plaintiff.                      )
                                        )
                                        )
                                        )
        v.                              )  C.A. No. 15-14139-MLW
                                        )
DIAGEO-GUINNESS, USA, INC. and          )
DIAGEO NORTH AMERICA, INC.,             )
        Defendants.                     )

MEMORANDUM AND ORDER

WOLF, D.J.                                          March 27, 2018

I.    INTRODUCTION

        Defendants Diageo-Guinness, USA, Inc. and Diageo North
America, Inc. make and market Guinness Extra Stout ("Extra Stout"),
a form of beer, for distribution in the United States. Plaintiff
Kieran O'Hara filed a putative class complaint alleging that he
bought Extra Stout in part because defendants deceptively
advertised that it was brewed at St. James's Gate brewery, Dublin,
Ireland. Plaintiff alleges that Extra Stout was actually brewed in
New Brunswick, Canada. Plaintiff alleges that he paid more for the
beer than he would have if defendants had disclosed its origin.
Plaintiff subsequently filed an amended complaint with seven
claims, including unjust enrichment, misrepresentation, and unfair
and deceptive practices in violation of Mass. Gen. Laws Chapter
93A. Defendants have moved to dismiss.

The court is denying the motion with respect to Count I, alleging misrepresentation. It is also denying the motion with respect to Counts III and IV to the extent that they allege that statements on defendants' website violated Mass. Gen. Laws Chapter 93A. The Amended Complaint states plausible claims that these statements reasonably deceived plaintiff into buying and paying a price premium for Extra Stout.

However, the court is dismissing the Chapter 93A claims to the extent that they are based on the labels affixed to Extra Stout's bottles and packaging. The labels were approved by the Alcohol Tobacco Tax and Trade Bureau (the "TTB") and, therefore, are entitled to safe harbor protection under Chapter 93A, §3. It is also dismissing Count II, alleging unjust enrichment, because plaintiff has adequate remedies at law. In addition, plaintiff has not alleged any threatened injury to himself that could be prevented by prospective relief, and his claim for a declaratory judgment duplicates his claims for damages. Accordingly, the claims for injunctive and declaratory relief are also being dismissed.

## II. APPLICABLE LEGAL STANDARDS

### A. Motion to Dismiss

Federal Rule of Civil Procedure 8(a)(2) requires that a complaint include a "short and plain statement of the claim showing that the pleader is entitled to relief." This pleading standard

does not require "detailed factual allegations," but does require "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007). In addition, "some allegations, while not stating ultimate legal conclusions, are nevertheless so threadbare or speculative that they fail to cross 'the line between the conclusory and the factual'" and must be disregarded. <u>Penalbert-Rosa v. Fortuno-Burset</u>, 631 F.3d 592, 595 (1st Cir. 2011) (quoting <u>Twombly</u>, 556 U.S. at 557 n.5).

To survive a motion to dismiss under Rule 12(b)(6), the complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Twombly</u>, 550 U.S. at 570). In considering a motion to dismiss under Rule 12(b)(6), the court must "take all factual allegations as true and...draw all reasonable inferences in favor of the plaintiff." <u>Rodriguez-Ortiz v. Marao Caribe, Inc.</u>, 490 F.3d 92, 96 (1st Cir. 2007); <u>Maldonado v. Fontanes</u>, 568 F.3d 263, 266 (1st Cir. 2009). An entitlement to relief is "plausible" if the facts "raise a reasonable expectation that discovery will reveal evidence" of the alleged misconduct, "even if it strikes a savvy judge that actual proof of those facts is improbable, and that recovery is very remote and unlikely." <u>Twombly</u>, 550 U.S. at 556; <u>see also</u> <u>Ocasio-Hernandez v. Fortuno-Burset</u>, 640 F.3d 1, 17 (1st Cir. 2011).

Nevertheless, "where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." Iqbal, 556 U.S. at 678. "[G]uaging a pleaded situation's plausibility is a 'context-specific' job that compels [the court] 'to draw on' [its] 'judicial experience and common sense.'" Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012)(quoting Iqbal, 556 U.S. at 677).

In addition, Rule 9(b) requires that "in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." This standard means that a complaint must specify the "time, place, and content of an alleged false representation," including misrepresentations forming the basis of a Chapter 93A claim. Mulder v. Kohl's Dep't Stores, Inc., 865 F.3d 17, 22 (1st Cir. 2017).

Under Rule 12(b)(6), the district court must consider the complaint, attached exhibits, "documents incorporated by reference into the complaint, matters of public record, and facts susceptible to judicial notice." Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011); In re Colonial Mortgage Bankers Corp., 324 F. 3d 12, 15 (1st Cir. 2003). "The court may judicially notice a fact that is not subject to reasonable dispute because it is generally known within [the court's] jurisdiction or can be accurately and readily determined from sources whose accuracy cannot reasonably be

questioned." F.R.E. 201(b). This includes "documents the authenticity of which [is] not disputed by the parties," Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993), and "official public records," Freeman v. Town of Hudson, 714 F. 3d 29, 36-37 (1st Cir. 2013). When such a document contradicts an allegation in the complaint, the document trumps the allegation. See Clorox Co. P.R. v. Proctor & Gamble Consumer Co., 228 F.3d 24, 32 (1st Cir. 2000) (citing Northern Indiana Gun & Outdoor Shows, Inc. v. City of South Bend, 163 F.3d 449, 454 (7th Cir. 1998)). These rules derive from "the axiom that a writing is the best evidence of its contents...[and the] tenant that a court may look to matters of public record in deciding a Rule 12(b)(6) motion." Colonial Mortgage Bankers, 324 F. 3d at 15-16.

When a defendant seeks dismissal based upon an affirmative defense, "the facts establishing the defense must be clear on the face of the plaintiff's pleadings." Blackstone Realty LLC v. FDIC, 244 F.3d 193, 197 (1st Cir. 2001). "Furthermore, review of the complaint, together with any other documents appropriately considered under Federal Rule of Civil Procedure P. 12(b)(6), must 'leave no doubt' that the plaintiff's action is barred by the asserted defense." Id.

B. Standing

The same standards apply to defendants' challenges to plaintiff's standing. The plaintiff must support each element of

standing "in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992). Therefore, where, as here, the factual allegations in the pleadings concerning jurisdiction are unchallenged, the court "must credit the plaintiff's well-pleaded factual allegations (usually taken from the complaint, but sometimes augmented by an explanatory affidavit or other repository of uncontested facts), draw all reasonable inferences from them in her favor, and dispose of the challenge accordingly." Valentin v. Hospital Bella Vista, 254 F. 3d 358, 363 (1st Cir. 2001).

To have standing to sue under Article III of the Constitution, plaintiff must have "a personal stake in the outcome of the controversy." Warth v. Seldin, 422 U.S. 490, 498 (1975)(citing Baker v. Carr, 369 U.S. 186, 204 (1962)). He "must allege and show that [he] personally ha[s] been injured" or will be injured without judicial relief, and "not that injury has been suffered" or will be suffered "by other, unidentified members of the class to which [he] belong[s] and which [he] purport[s] to represent." Id. at 502. "Unless [the plaintiff] can thus demonstrate the requisite case or controversy between [himself] personally and [defendants], [he] may [not] seek relief on behalf of [himself] or any other member of the class." Id.

In addition, the "plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." Town of Chester, N.Y. v. Laroe Estates, Inc., 137 S. Ct. 1645, 1650 (2017). Therefore, a plaintiff who has standing to seek damages must also demonstrate standing to pursue injunctive relief." Id. "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief...if unaccompanied by any continuing, present adverse effects." O'Shea v. Littleton, 414 U.S. 488, 495 (1974).

The "irreducible constitutional minimum of standing consists of three elements." Lujan, 504 U.S. at 560. First, there must be an "actual or imminent" "'injury in fact'--an invasion of a legally protected interest which is concrete and particularized." Id.; see also Katz v. Pershing, LLC, 672 F.3d 64, 71-72 (1st Cir. 2012). A threatened injury confers standing to seek injunctive relief if it "is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." Clapper v. Amnesty Int'l, 133 S. Ct. 1138, 1147, 1150, n. 5 (2013). "Second, there must be a causal connection between the injury and the conduct complained of--the injury has to be fairly traceable to the challenged action of the defendant, and not...the result of the independent action of some third party not before the court." Lujan, 504 U.S. at 560. "Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Id. at 561.

C. Misrepresentation

To state a claim for intentional misrepresentation, the complaint must allege that the defendant "[1] made a false representation of a material fact [2] with knowledge of its falsity [3] for the purpose of inducing the plaintiff to act thereon, and [4] that the plaintiff reasonably relied upon the representation as true and acted upon it [5] to [her] damage." Eureka Broadband Corp. v. Wentworth Leasing Corp., 400 F.3d 62, 68 (1st Cir. 2005). The element of "damage" requires pecuniary loss. See Shaulis v. Nordstrom, Inc., 865 F.3d 1, 15 (1st Cir. 2017); Restatement (Second) of Torts §525 (1977). "A representation stating the truth so far as it goes but which the maker knows or believes to be materially misleading because of his failure to state additional or qualifying matter is a fraudulent misrepresentation." Id. at §529.

A plaintiff may justifiably rely on a representation even if he would have discovered the truth through an investigation "without considerable trouble or expense." Restatement (Second) of Torts at §540; accord Kuwaiti Danish Computer Co. v. Digital Equip. Corp., 438 Mass. 459, 467 (2003). Nevertheless, "if a mere cursory glance would have disclosed the falsity of the representation, its falsity is regarded as obvious," and reliance on it would not be justified. Id. Therefore, "although the recipient of a fraudulent misrepresentation is not barred from recovery because he could

have discovered its falsity if he had shown his distrust of the maker's honesty by investigating its truth, he is nonetheless required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." Restatement (Second) of Torts at §541.

### D. Mass. Gen. Laws Chapter 93A

Mass. Gen. Laws Chapter 93A, §2 prohibits "unfair or deceptive acts or practices" in business and consumer transactions. Edlow v. RBW, LLC, 688 F. 3d 26, 39 (1st Cir. 2012)(quoting Green v. Blue Cross & Blue Shield of Mass., Inc., 47 Mass. App. Ct. 443 (1999)). A representation about a product is "deceptive" under Chapter 93A "when it has the capacity to mislead consumers, acting reasonably under the circumstances, to act differently from the way they otherwise would have acted (i.e., to entice a reasonable consumer to purchase [a] product)." Edlow, 688 F. 3d at 39 (quoting Aspinall v. Philip Morris Companies, Inc., 442 Mass. 381, 394 (2004)). The court decides the "boundaries of what may qualify for consideration as a [Chapter] 93A violation," but within those bounds, "whether a particular set of acts...is unfair or deceptive is a question of fact." Milliken & Co. v. Duro Textiles, LLC, 451 Mass. 547, 563 (2008).

940 Code Mass. Regs. §3.16(3) states that "an act or practice is a violation of [Chapter 93A] if...it fails to comply with existing [Massachusetts] statutes, rules, regulations or laws, meant for the protection of the public's health, safety, or welfare...intended to provide [Massachusetts] consumers protection." In Klairmont v. Gainsboro Rest., Inc., however, the Supreme Judicial Court held that a violation of such a statute or regulation constitutes a violation of Chapter 93A "only if the conduct leading to the violation is...unfair [or] deceptive and occurs in trade or commerce." 465 Mass. 165, 174 (2013); see also McDermott v. Marcus, Errico, Emmer & Brooks, P.C., 775 F. 3d 109, 116-120 (1st Cir. 2014). In Klairmont, for example, the court stated that "not all building code violations--indeed, very few--will give rise to violations of Chapter 93A, either because they would lack the unfairness or deceptiveness present in this case or because they do not arise in trade or commerce." 465 Mass. at 174. However, because the defendants had "violated the building code for decades to avoid the expense and complications of required improvements, and the violations created a hazardous environment for patrons of the defendants' business, a danger of which the defendants were well aware," the defendants were liable under Chapter 93A. Id. at 177.

"The state has authority to seek heavy sanctions on those who engage in deceptive advertising even without injury" to any

individual consumer. Rule v. Fort Dodge Animal Health, Inc., 607 F. 3d 250, 255 (1st Cir. 2010). However, Chapter 93A, §9 gives the individual consumer a right to sue only when he suffers an "objective, identifiable harm that goes beyond the deception [or unfairness] itself." Shaulis, 865 F.3d at 10. Allegations that the deceptive conduct inflated the product's price, causing the plaintiff to overpay, suffice. Id. at 10.[1] However, "claims of injury premised on 'overpayment' for a product, or a loss of the benefit of the bargain, require an objective measure against which the plaintiff's allegations may be evaluated" and may not rest on the plaintiff's "subjective belief" that he received a less valuable product than he paid for. Id. "The complaint must identify a legally required standard that the [product was] at least implicitly represented as meeting, but allegedly did not." Iannacchino v. Ford Motor Co., 451 Mass. 623, 633 (2008). In addition, overpayment may not be inferred solely from the fact

---

[1] Injuries under Chapter 93A may be "non-economic," and may include personal injury, "measurable emotional distress," or an "invasion of a consumer's personal privacy" at least if it causes "injury or harm worth more than a penny." Ferreira v. Sterling Jewelers, Inc., 130 F. Supp. 3d 471, 478 (D. Mass. 2015) (quoting Tyler, 464 Mass. at 504 n. 20). Plaintiff, however, does not argue that defendants caused him personal injury, emotional distress, or violated any interest in privacy.

that a product was deceptively advertised, since the deception itself cannot be the requisite injury. Id. at 11.[2]

Chapter 93A exempts a defendant's conduct from liability if the conduct is authorized under another statute. Specifically, Chapter 93A, §3 provides that "nothing in this chapter shall apply to transactions or action otherwise permitted under laws as administered by a regulatory board or officer acting under statutory authority of the commonwealth or of the United States." The defendant has the burden of proving that its conduct fell under this "safe harbor" exemption. See Aspinall, 453 Mass. at 434-35 (2009). To sustain that burden, it "must show more than the mere existence of a related or even overlapping regulatory scheme that covers the transaction. Rather, [the] defendant must show that such scheme affirmatively permits the practice which is alleged to be unfair or deceptive." Bierig v. Everett Sq. Plaza Assocs., 34

---

[2] In Shaulis, the First Circuit held that a plaintiff who purchased a sweater from Nordstrom believing that she was receiving a discount from the full retail price did not sufficiently allege a cognizable injury because she "fail[ed] to identify any bargained-for characteristic of the sweater that she did not receive." 865 F. 3d at 12. Although the plaintiff alleged that she would not have purchased the sweater in the absence of Nordstrom's misrepresentation, she "[did] not allege that it [was] worth less than the selling price, that it was manufactured with shoddy materials or inferior workmanship, that it is of an inferior design, or that it is otherwise defective." Id. Therefore, there were no facts to support the inference that the sweater was "worth less than the price she paid at the moment she bought it." Id.

Mass. App. Ct. 354, 367 n. 14 (1993); Greany, <u>Chapter 93A Right</u> <u>and Remedies</u> §6-4 (1992). In <u>Bierig</u>, for example, a group of high-income tenants renting units in a subsidized housing project alleged that their rent illegally exceeded the maximum "below market rate" that the landlord could charge under the applicable regulations. 34 Mass. App. Ct. 354, 367 (1993). The court, however, held that the challenged rents were entitled to safe harbor because the "statutory scheme...expressly permitted rents for [high income] tenants to be above the 'below market rates' and implicitly required it,"[3] and the Massachusetts Housing Finance Agency had approved the rates. <u>Id.</u> at 367-68.

Courts applying <u>Bierig</u>, including this court, have held that Chapter 93A claims are precluded when a regulator authorized to review the defendant's actions has determined that those actions, in particular, were not unfair or deceptive. <u>Compare</u> <u>Cablevision</u> <u>of Boston, Inc. v. Public Imp. Com'n of City of Boston</u>, 38 F. Supp. 2d 46, 60-61 (D. Mass. 1999)(holding that defendants were likely to prove that municipal agency's approval of defendant's allegedly unfair and deceptive act, the conversion of telecommunications

---

[3] The governing statute, as interpreted by the Supreme Judicial Court, authorized the MHFA to approve rental rates no lower than necessary to fund the subsidies to low-income tenants in the project and in any event "no[] lower than the below-market [rate] for the unit "<u>Id.</u> at 365-66.

conduits to new uses, precluded Chapter 93A claim), aff'd 184 F. 3d 88 (1st Cir. 1999); Rogers v. Comcast Corp, 55 F. Supp. 3d 711, 721 (E.D. Pa. 2014)(holding that allegedly anti-competitive transaction could not premise Chapter 93A liability because it was approved by the FTC) with Aspinall, 453 Mass. at 434-35 (holding that FTC's failure to prosecute defendant for describing cigarettes as "light" was not "affirmative permission" to use the descriptor, even though an FTC consent decree authorized another cigarette manufacturer to use a similar term). Courts applying comparable state statutes have reached the same conclusion. See Kuenzig v. Hormel Foods Corp., 505 Fed. App'x 937, 939 (11th Cir. 2013)(applying Florida law); Cruz v. Anheuser-Busch, LLC, 2015 WL 3561536, at *3-4 (C.D. Cal. 2015)(applying California law). So interpreted, §3 enables a defendant to rely on regulators' authoritative and particularized determination that its product or conduct is not unfair or deceptive.

E. The TTB Regulatory Framework

The Federal Alcohol Administration Act (the "FAAA"), 27 U.S.C. §§201-219, regulates the sale of alcohol beverages, including beer, in interstate commerce. The FAAA "was designed as a comprehensive statute to deal with practices within the alcohol beverage industry that Congress had judged to be unfair and deceptive, resulting in harm to both competitors and consumers." Adolph Coors Co. v. Brady, 944 F. 2d 1543, 1547 (10th Cir. 1991).

Specifically, the statute requires alcoholic beverages to be "bottled, packaged, and labeled in conformity with...regulations, to be prescribed by the Secretary of the Treasury." 27 U.S.C. §205(e). Those regulations must "prohibit deception of the consumer with respect to such products" and "provide the consumer with adequate information as to the identity and quality of the product." Id.

The Secretary's duties to enforce the FAAA have been delegated to the TTB, which has enacted regulations specifically addressing the labeling of malt beverages, including beer.[4] Before releasing a beer product, bottlers and distributors must first apply for and obtain a Certificate of Label Approval (a "COLA") from the TTB. See 27 C.F.R. §§7.41, 25.142(e). The TTB may not issue a COLA unless the product's labelling "complies with applicable laws and regulations." 27 C.F.R. §13.21(a); see also §7.20 ("No person engaged in business as a brewer, wholesaler, or importer of malt beverages...shall sell, ship, or deliver for sale or shipment...in interstate or foreign commerce commerce...any malt beverages in containers unless the malt beverages are packaged, and the packages are marked, branded, and labelled in conformity with this subpart.").

---

[4] The parties do not dispute that beer and, in particular, Extra Stout, is a malt beverage within the meaning of 27 C.F.R. §7.10.

15

The applicable regulations require, among other things, that:

> Each bottle of beer...show by label or otherwise the name or trade name of the brewer, the net contents of the bottle, the nature of the product such as beer, ale, porter, stout, etc., <u>and the place of production</u> (city and, when necessary for identification, State).

27 C.F.R. §25.142(a)(emphasis added). They also prohibit placing on any label "any statement that is false or untrue in any particular, or that, irrespective of falsity, directly or by ambiguity, omission, or inference, or by the addition of irrelevant, scientific or technical matter, tends to create a misleading impression." 27 C.F.R. §§7.29(a)(1). More specifically, §7.23(b) provides that:

> No label shall contain any brand name,[5] which, standing alone, <u>or in association with other printed or graphic matter</u>, creates any impression or inference as to the age, <u>origin</u>, or other characteristics of the product unless the appropriate TTB officer finds that such brand name...conveys no erroneous impressions as to the age, <u>origin</u>, or other characteristics of the product.

<u>Id.</u> (emphasis added). These regulations apply to labels on bottles as well as "any carton, case, or other covering of the container." <u>Id.</u> at §7.21.

---

[5] A "brand name" is the "name or symbol used by a seller or manufacturer to identify goods or services and to distinguish them from competitors' goods or services." <u>Parent v. MillerCoors LLC</u>, 2015 WL 6455752, at *7 (S.D. Cal. 2015)(quoting Black's Law Dictionary (9th Ed. 2009)).

Accordingly, the TTB may not issue a COLA if the label creates a misleading impression as to the characteristics of the product, including its origin.

III. THE AMENDED COMPLAINT

Defendants manufacture, market, package, and distribute Guinness Extra Stout, a beer, in the United States. Am. Compl. at ¶¶7-8. Guinness Extra Stout is bottled and packaged in a carton depicted in photographs attached to the Amended Complaint as Exhibits 1 and 2. Id. at ¶¶20-21. The carton displays a large oval logo containing the words "Guinness Extra Stout" in bold, capital letters across the center. Above those letters is a picture of the Brian Boru harp and the year "1759," and below them, in small letters, the words "Imported Guinness Extra Stout." Id. The phrase "Traditionally Brewed" is strung along the upper radius of the oval. Id.

The phrase "St. James's Gate Dublin" appears along the lower radius. Id. The same label is pictured on the front of the bottles. Id. at ¶¶22-23. Plaintiff alleges that the language "Traditionally brewed" and "St. James's Gate Dublin," in conjunction with the language "Imported Guinness Extra Stout" "gives and reinforces the impression that Extra Stout is manufactured, sourced, brewed, bottled and/or imported from Ireland," and in particular, "St. James's Gate, Dublin, Ireland." Id. at ¶¶24-25.

The Frequently Asked Questions page of Guinness's website also states that "All Guinness sold in the UK, Ireland, and North America is brewed in Ireland at the historic St. James's Gate Brewery in Dublin." Id. at ¶¶11-14.

However, "Extra Stout is not manufactured, brewed, bottled and/or imported from Ireland." Id. at ¶¶32. On the side of each bottle, Guinness Extra Stout displays a small disclosure reading:

> Imported by DIAGEO – Guinness USA, Stamford, CT. Brewed and bottled by Guinness Brewing Company, New Brunswick, Canada. Product of Canada.

Id. at ¶35, Exs. 4 and 5. This disclaimer, according to plaintiff, is not sufficiently conspicuous to notify a consumer that, despite the labels on the front of the carton and the bottle, Extra Stout sold in the United States is imported from Canada, rather than Ireland.

"Plaintiff purchased Guinness Extra Stout because, in part, he believed Extra Stout was manufactured, brewed, bottled and/or imported from the St. James's Gate Brewery, Dublin Ireland." Id. at ¶54. He alleges that in doing so "[a]s a result of defendants' representations," including their "labelling/marketing," he "paid a premium price for Extra Stout." Id. at ¶¶52-52.

Plaintiff seeks to represent a class of consumers who purchased Guinness Extra Stout at stores and restaurants while defendants deceptively represented that the beer was made and bottled in Ireland, comprising subclasses of consumers who

purchased the product in Massachusetts and across the United States. He claims common-law misrepresentation (Count I), Unjust Enrichment (Count II), and violations of Mass. Gen. Laws Chapter 93A (Counts III, IV, V, and VI). He also seeks a Declaratory Judgment (Count VII). Counts IV, V, and VI allege violations of Chapter 93A based on violations of several Massachusetts regulations and a statute, including 940 C.M.R. 3.02 (false advertising) (Count IV) and Mass. Gen. Laws Chapter 94, §187 (misbranding) on its own (Count V) and as interpreted in 105 C.M.R. 520.115 (requiring Chapter 94-mandated disclosures to be displayed on a product's label with "prominence and conspicuousness")(Count VI).[6] He seeks, in addition to the declaratory judgment, damages in the amount of the purchase price for Guinness Extra Stout or any price premium paid as a result of the alleged misrepresentations, as well as injunctive relief.

Defendants have moved to dismiss. See Docket No. 17. They attached two documents to the motion. Exhibit 1 is a copy of the COLA for Extra Stout. The COLA consists of defendants' application

---

[6] As explained earlier, conduct that violates an independent statute or regulation, unless expressly termed an "unfair and deceptive" practice by statute, is a violation of Chapter 93A only if the conduct is unfair or deceptive and occurs in trade or commerce. See McDermott v. Marcus, Errico, Emmer & Brooks, P.C., 775 F. 3d 109, 116-120 (1st Cir. 2014); Klairmont v. Gainsboro Rest., Inc., 465 Mass. 165, 174 (2013).

19

to the TTB with the signature of the TTB officer who certified it. The document includes the labels affixed to bottles of Extra Stout, which are identical to those pictured in the Amended Complaint. Compare Def's Ex. 1 with Am. Compl. at ¶¶20-23, 35-37, Exs. 1-5. Exhibit 2 is a copy of the COLA Detail for Extra Stout, which is a webpage on the TTB's website containing certain information about the status of the COLA for Extra Stout, including a link to a "Printable Version" of the COLA. Plaintiff has moved to strike those exhibits.

IV.  DISCUSSION

A.  Scope of the Record

The court is denying the motion to strike Exhibits 1 and 2 to defendants' Motion to Dismiss.

As explained earlier, the court may take judicial notice of "official public records" in deciding a motion to dismiss. Watterson, 987 F. 3d at 3. Not all records in the possession of a public agency are "official public records" susceptible to judicial notice. Freeman, 714 F. 3d at 36-37. Some documents, such as police reports, lack the "indicia of reliability" that place "official records, such as birth or death certificates and other similar records of vital statistics" "beyond reasonable dispute." Id. at 36. Nevertheless, "judicial notice is properly taken of orders and decisions made by other courts or administrative agencies" when the preclusive effect of those decisions is at

issue. <u>Papai v. Harbor Tug and Barge Co.</u>, 67 F.3d 203, 207 n.5 (9th Cir. 1995), <u>rev'd on other grounds</u>, 520 U.S. 548 (1997); <u>see also</u> Fishman & McKenna, 1 <u>Jones on Evidence</u> §2:110 (7th Ed. 2016)(stating that "as a rule, courts now judicially notice the public acts, reports, records and regulations made, kept, conducted or issued by administrative agencies" but "generally may do so only to note the existence of the document, not for the truth of the facts recited therein"). That is, when a government document is "relevant not for the truth of anything asserted in [it]" but simply for its legal effect, the court may take judicial notice of the document. <u>Torrens v. Lockheed Martin Services Group, Inc.</u>, 396 F. 3d 468, 473 (1st Cir. 2005).

Plaintiff does not dispute that Exhibit 1 is an authentic copy of the TTB's decision to approve the labels on bottles of Extra Stout, or that Exhibit 2 is an authentic copy of the COLA Detail for Extra Stout on the TTB's website. In any event, the TTB describes the documents as such on its website. <u>See</u> Exhibit 2 (webpage titled "COLA Detail" containing a link to the COLA for Extra Stout, which are identical to Exhibits 2 and 1 respectively); <u>see also</u> <u>Gent v. CUNA Mut. Ins. Soc'y</u>, 611 F.3d 79, 84 n.5 (1st Cir. 2010)(taking "judicial notice of the relevant facts provided on the [Center for Disease Control's] website, which are "not subject to reasonable dispute"). Accordingly, the court may consider both documents in deciding whether the TTB "permitted"

defendants to use the allegedly deceptive labelling. See Singleton v. Fifth Generation, Inc., 2016 WL 406295, at *2 (N.D.N.Y. 2016)(considering COLA to determine, in applying state "safe harbor" doctrine, whether TTB authorized allegedly deceptive labeling on beverage products); Cruz v. Anheuser-Busch, LLC, 2015 WL 3561536, n. 10 (C.D. Cal. 2015)(same); Marty v. Anheuser-Busch Cos., LLC, 43 F. Supp. 3d 1333, 1337 (S.D. Fla. 2014)(same).

Plaintiff argues that Exhibit 1 includes certain representations by defendants that may not have been verified by the TTB, such as the fact that the labels affixed to the application "truly and correctly represent the content of the containers to which these labels will be applied." Exhibit 2 at 1. However, whether the defendants' statements relating to the beer's contents were correct is irrelevant to the material issue--whether the TTB approved, as not misleading, the statements relating to its origin. Plaintiff does not dispute that the labels pictured on the COLA are identical to those pictured in the Amended Complaint and that the TTB approved those labels. Compare Def's Ex. 1 with Am. Compl. at ¶¶20-23, 35-37, Exs. 1-5. Therefore, the authenticity of Exhibit 1 as the COLA approving the labels on the bottle described in the Amended Complaint is undisputed, and the court may consider it to determine whether the labels can in this case be found to be misleading.

Plaintiff also points out that in Exhibit 2, the COLA Detail, the TTB disclaims legal liability for inaccuracies in "data such as company names, addresses permit numbers, and other data provided in [its] registry." Def. Ex. 2 at 2. However, the disclaimer does not undermine the webpage's reliability as proof that the TTB recorded Extra Stout's "origin" as "Canada" when issuing the COLA. See id. at 1 ("Origin Code: Canada"). The court is not relying on any remaining statements of fact in the exhibits, including the defendants' statements, because they are irrelevant to whether the TTB approved Extra Stout's labels knowing that it was brewed in Canada.

Accordingly, the motion to strike is being denied.

B.    Injury

As indicated earlier, to create standing, the defendant's actions must have injured the plaintiff. Lujan, 504 U.S. at 561. A plaintiff asserting a Chapter 93A claim must have suffered "objective, identifiable harm" from the alleged deception, which may include the loss of the benefit of his bargain. Shaulis, 865 F.3d at 10. Similarly, a misrepresentation claim requires pecuniary loss. Id. Plaintiff has pled facts supporting a plausible inference that he suffered a judicially cognizable injury compensable under both causes of action.

Plaintiff alleges that he "paid a premium price believing that Extra Stout is manufactured, brewed, naturally sourced,

bottled and/or imported from St. James's Gate, Dublin, Ireland" "as a result" of defendants' unlawful representations on its packaging and website. Am. Compl. at ¶48-49; Twombly, 550 U.S. at 559. This case is, therefore, different from Shaulis, in which the plaintiff never alleged that the sweater she bought was "worth less than the selling price." Shaulis, 865 F. 3d at 12. Plaintiff alleges that the product he received, Extra Stout brewed in Canada, was worth less than the product he expected, Extra Stout brewed in Ireland. Paying for a product whose price was artificially inflated by deceptive advertising is an economic injury cognizable under Chapter 93A. Id. Damages for such an injury are the difference between the value of the product as advertised--Extra Stout brewed in Ireland--and the price plaintiff paid. See Restatement (Second) of Torts §549, cmt. c.

However, the allegation that plaintiff paid a "price premium" "as a result" of defendants' deception is, by itself, too "conclusory" and speculative" to state a claim for injury or damages. Id. at 12. Rather, as explained earlier, to state a claim based on overpayment for a product, there must be factual allegations from which a jury could conclude that the product at issue was "deficient in some objectively identifiable way." Shaulis, 865 F. 3d at 12.

In Iannacchino, the Supreme Judicial Court (the "SJC"), suggested that a car manufacturer failure to comply with federal

24

safety standards, if adequately alleged, would permit the factfinder to infer financial injury to its current owner. It wrote that:

> [i]f Ford knowingly sold noncompliant (and therefore potentially unsafe) vehicles or if Ford, after learning of noncompliance, failed to initiate a recall and to pay for the condition to be remedied, the plaintiffs would have paid for more (viz., safety regulation-compliant vehicles) than they received. Such an overpayment would represent an economic loss--measurable by the cost to bring the vehicles into compliance--for which the plaintiffs could seek redress under G.L. c. 93A, §9.

451 Mass. at 631. However, adopting the standard established in Twombly, the SJC found the complaint did not state a claim because it relied on a "conclusory" allegation that a group of car owners overpaid for a model of Ford cars as a result of Ford's misrepresentations. 451 Mass. at 624. The plaintiffs alleged that the cars were "defective" because, under certain conditions, the door latches opened on impact. Id. at 633. The court held, however, that:

> Because the term "defect" is conclusory and can be subjective as well, a bare assertion that a defendant, while representing the opposite, has knowingly manufactured and sold a product that is "defective," or suffers from "safety-related defects," does not suffice to state a viable claim. Where, as in this case, there is no allegation that the plaintiffs--or indeed anyone else --have suffered personal injury or property damage, the complaint must identify a legally required standard that the vehicles were at least implicitly represented as meeting, but allegedly did not. When the standard that a product allegedly fails to meet is not one legally required by and enforced by the government, a claim of economic injury based on overpayment lacks the premise

25

> that the purchase price entitled the plaintiffs to a
> product that met that standard.

Id. at 632-33.


As the court later confirmed in Bellermann v. Fitchburg Gas

and Elec. Light Co., a regulatory violation does not itself

establish a Chapter 93A injury. 475 Mass. 67, 73 (2016). However,

the court in Bellerman stated that because "safety standards play

a highly significant role" in a consumer's decision to purchase a

car, it was plausible that a "noncompliant vehicle...would be worth

less to its owner than a compliant one." Id. at 74. Therefore,

"had the regulatory noncompliance...in Iannacchino been [properly

alleged and] established, it would have been adequate to support

a claim of economic injury." Id.; see also Shaulis, 865 F. 3d at

9.

Similarly, a jury may draw a "common sense inference" of

overpayment when a product is advertised to be healthier than it

is, at least when the deceptive advertisement violates a

regulation. Geanacopoulos v. Philip Morris USA, 2016 WL 757536, at

*15 (Mass. Super. Ct. 2016). In Aspinall, the plaintiffs alleged

that they bought cigarettes deceptively advertised as "Marlboro

Lights." 442 Mass. at 384. Despite federal regulations requiring

"light" cigarettes to deliver lower levels of tar and nicotine

than regular cigarettes, Marlboro Lights delivered "as much or

more" of those toxins as compared to regular Marlboros. Id. at 386. The court held that plaintiffs stated a cognizable injury because "logic...suggests that all other things being equal, a truly low tar and nicotine cigarette would have economic worth greater than a comparable regular cigarette, due to the added value of an inherently 'safer' cigarette." Aspinall, 442 Mass. at 400. Aspinall was decided before Twombly and Iannacchino. Nevertheless, in Bellerman, the court reaffirmed Aspinall, explaining that the plaintiffs had stated a claim on behalf of each putative class member because "each...had purchased and smoked cigarettes that did not deliver the advertised health benefits." 475 Mass. at 75. Therefore, it was plausible that the products "were worth less, as used and owned, than what the plaintiffs had paid." Id.

Unlike in Aspinall, plaintiff here does not allege that Canadian Extra Stout was less healthy or less safe than advertised. The complaint lacks any allegation that Canadian Extra Stout contains lower-quality ingredients than the Irish-brewed variety. See Shaulis, 865 F. 3d at 12. Nevertheless, "gauging a pleaded situation's plausibility is a 'context-specific' job that compels [the court] 'to draw on' [its] 'judicial experience and common sense.'" Schatz, 669 F.3d at 55. Common sense supports the conclusion that consumers may value characteristics other than a product's safety, nutrition, or taste to an extent sufficient to raise the product's price. As plaintiff points out, it is plausible

27

that, for some products, the place of production may be such a characteristic. It is plausible, for example, that as plaintiff argues, a grocer could charge more for salt from New Jersey if he represents that it comes from the Dead Sea. See Pl. Opp. at 2 n. 8. Indeed, as explained earlier, federal and state regulations, designed to protect consumers, prohibit false statements on a malt beverage's label concerning the product's "origin," and thus recognizes that misrepresentations about a product's provenance can influence consumers' purchasing decisions. 27 C.F.R. §7.23(b); 940 C.M.R. 3.02(2); Adolph Coors Co., 944 F. 2d at 1547.[7] Accordingly, in Marty, interpreting Florida law, the court found it "plausible" that consumers would pay higher prices for imported beer brewed in Europe than for beer brewed domestically. See 43 F. Supp. 3d at 1345-46.

---

[7] 940 C.M.R. 3.02(2), which plaintiff in Count IV alleges was violated, provides that:

> No statement or illustration shall be used in any advertisement which creates a false impression of the grade, quality, make, value, currency of model, size, color, usability, or origin of the product offered, or which may otherwise misrepresent the product in such a manner that later, on disclosure of the true facts, there is a likelihood that the buyer may be switched from the advertised product to another. Even though the true facts are subsequently made known to the buyer, the law is violated if the first contact or interview is secured by deception.

Id. (emphasis added).

Similarly, the court finds it plausible that Extra Stout's origin "play[s] a highly significant role" in a consumer's decision to purchase Extra Stout, such that a Canadian-sourced version of the beer, if its origin were known, "would be worth less" than the Irish-brewed variety. Bellerman, 475 Mass. at 74. Defendants describe the St. James's Gate brewery in Dublin as "historic." Am. Compl. at ¶¶13-19; Def's Memo at 8. From the prominence with which the location appears on the labels, the alleged fact that it is advertised on both the website and the labels, and the purported long history of association between the brand "Guinness" and "St. James Gate Dublin," see id. (explaining that "Guinness first trademarked its signature label—an oval label picturing the famous Brian Boru harp and the words 'James's Gate Dublin' in 1876 "to preserve the Guinness brand name"), among other things, a reasonable jury could conclude that the place that Extra Stout is brewed influences consumers' decisions to purchase the beer and its price.

## C. Misrepresentation, and Chapter 93A Claims Concerning Statements on Defendants' Website

The Amended Complaint also states a claim that Extra Stout's labelling and website are misleading and induced plaintiff to purchase Extra Stout. Therefore, Count I, alleging that defendants made "knowing and/or wilful misrepresentation(s)," Am. Compl. at

¶¶85-86, and Counts III and IV, alleging violations of Mass. Gen. Laws Chapter 93A, state claims on which relief can be granted.

As explained earlier, Rule 9(b) requires that plaintiff "to specifically plead the time, place, and content of [the] alleged false representation[s]" underlying the intentional misrepresentation and Chapter 93A claims. Mulder v. Kohl's Dep't Stores, Inc., 865 F.3d 17, 22 (1st Cir. 2017). The First Circuit has said that Rule 9(b) is designed to "[give] notice to defendants of the plaintiffs' claim" and to block meritless claims, which "[protects] defendants whose reputation may be harmed [such claims], [discourages] 'strike suits,' and [prevents] the filing of suits that simply hope to uncover relevant information during discovery." U.S. ex rel. Nargol v. DePuy Ortho., Inc., 865 F. 3d 29, 38 (1st Cir. 2017).

Plaintiff alleges the place--defendants' website and all bottles and cartons containing Extra Stout sold in the United States--and the content of the alleged misrepresentations, as described earlier. See Am. Compl. at ¶¶12-25. In addition, plaintiff alleges that on November 20 and 25, 2015, he saw a statement on defendants' webpage stating that Extra Stout is brewed in St. James' Gate, Dublin, Ireland. Am. Compl. at ¶¶12-13.[8]

---

[8] A letter from counsel for defendants attached to the Amended Complaint as Exhibit 8 states that "for business reasons having

30

However, the Amended Complaint does not include any particular time period during which the allegedly deceptive labels appeared on bottles and cartons of Extra Stout.

In Learning Express, Inc. v. Ray-Matt, cited by defendants, the court dismissed fraud-based counter-claims alleging that a franchiser fraudulently promised that it would train and otherwise support the defendants, its franchisees, who were opening a new franchise location. 74 F. Supp. 2d 79, 85-86 (D. Mass. 1999). The court found that the franchisees did not allege with sufficiently particularity when the misrepresentations were made. "Although [the] Counterclaim describe[d] with particularity the speaker, their statements, and where the statements were made, the pleadings omit[ted] any mention of time or date other than the general statement that '[o]n or about January, 1996, the [counterclaimants] became interested in locating a franchise business to pursue.'" Id.

In this case, however, the parties agree on an approximate time period during which the allegedly misleading statements were

_____

nothing to do with [Plaintiff's] allegations, the brewing and bottling of Guinness Extra Stout was moved to St. James's Gate, Dublin, Ireland in Summer 2015." Ex. 8 at 2. As explained earlier, the court may consider exhibits to the complaint for the purposes of a motion to dismiss. See Haley, 657 F.3d at 46. However, it does not accept defendant's statements in Exhibit 8 as true because plaintiff contests their accuracy.

made. In his opposition, plaintiff concedes that he is not pursuing, and defendants will not be compelled to defend, claims before December 15, 2011, the beginning of the 4-year statute of limitations applicable to claims alleging misrepresentation. See Pl. Opp. at 11 n. 24. In any event, defendants admit that the allegedly deceptive statements appeared on bottles of Extra Stout from at least 2004 to March 2015, and do not contend that they have changed since then. See Ex. 1 to MTD (Docket No. 19-1) (June 1, 2004 COLA displaying Extra Stout labelling); Ex. 6 to Def.'s M. to Strike (Docket No. 25-6)(March 20, 2015 COLA displaying Extra Stout labelling). Therefore, in view of defendants' concessions, the Amended Complaint is sufficient to inform them of: the time period during which the statements are alleged to have appeared-- from December 15, 2011 to the present, see Pl. Opp. at 11 n. 24; their contents, see Am. Compl. at ¶¶20-25; and why they are alleged to be false--because Extra Stout was brewed in Canada when the statements were made. See Martin v. Mead Johnson Nutrician Co., 2010 WL 3928707, at *4 (D. Mass. 2010)(holding that consumer plead fraud-based Chapter 93A claim with particularity where she stated that the "class consists of Massachusetts residents who purchased the product from September 25, 2005 to the present" and "included with her complaint dated copies of [the]...advertisements" alleged to be deceptive); see also Von Koenig v. Snapple Beverage Co., 713 F. Supp. 2d 1066, 1077 (E.D. Cal. 2010)(citing comparable cases).

Although plaintiff does not state when or where he purchased Extra Stout, the "specificity requirement extends only to the particulars of the allegedly misleading statement itself," not to the circumstances of the plaintiff's conduct in reliance on it. Rodi v. S. New England Sch. Of Law, 389 F.3d 5, 15 (1st Cir. 2004). Although the allegations do not include particular dates, they include factual statements stating a plausible claim that plaintiff purchased Extra Stout while it was brewed in Canada. See Am. Compl. at ¶46-55 (stating that "Extra Stout is manufactured, brewed, bottled and/or imported from Canada" and that plaintiff "purchased Extra Stout in Massachusetts" because he believed that Extra Stout made in Ireland). Therfore, even if the court accepted that defendants have made Extra Stout in Ireland since summer 2015, the Amended Complaint sufficiently alleges that plaintiff saw the challenged statements and purchased the product before the change in source.

Plead with particularity when necessary, the factual allegations also create a plausible inference that the labels on Extra Stout's bottles and cartons and on defendants' website could mislead a reasonable consumer into believing that Extra Stout was brewed in Ireland. The words "traditionally brewed" and "St. James Gate Dublin" are situated around the same logo. A reasonable consumer could have read them to mean that Extra Stout was then brewed "in a traditional manner" at St. James Gate, Dublin,

Ireland. Webster's Third New International Dictionary (1981) at 2422. The statement "Imported Guinness Extra Stout" reinforces this message. Am. Compl. at ¶¶20-21. Moreover, plaintiff alleges that defendants' website, in November 2015, stated that "all the Guinness sold in...North America is brewed in Ireland at the historic St. James's Gate brewery in Dublin." Am. Compl. at ¶13. If, as plaintiff alleges, Extra Stout was brewed in Canada at that time, the message communicated by both the labels and the website is false.

Defendants point out that fine print on the side of the bottles disclosed that Extra Stout was brewed in Canada. However, "reasonable consumers [are not] expected to look beyond misleading representations on the front of the [container] to discover the truth from the ingredient list in small print on the side" of it. Marty, 43 F. Supp. 3d at 1342 (citing Williams v. Gerber Prods. Co., 552 F.3d 934, 939 (9th Cir. 2008)).[9]

---

[9] Both Marty and Williams involved claims under consumer protection statutes prohibiting conduct capable of deceiving a reasonable consumer, comparable to Chapter 93A, see Edlow, 688 F. 3d at 39. Chapter 93A may apply to a broader category of misleading statements than common-law misrepresentation. In general, "an action under Chapter 93A need not articulate every element of a common law tort claim" as long as the defendant's allegedly unfair conduct "come[s] within shouting distance of some established concept of unfairness." Cummings v. HPG Intern, Inc., 244 F. 3d 16, 25 (1st Cir. 2001). However, defendants do not address the distinct standards applicable to common-law misrepresentation claims or whether the statements at issue satisfy them. They only

In summary, the Amended Complaint states a claim that Extra Stout's bottling, packaging, and website were deceptive, that plaintiff relied on the deceptive statements in purchasing the product, see Am. Compl. at ¶54, and that he overpaid for the product as a result, as explained earlier. He has, therefore, stated claims for misrepresentation and, as to the statements on defendants' website, a deceptive statement in violation of Mass. Gen. Laws Chapter 93A. See Eureka, 400 F. 3d at 68; Edlow, 688 F. 3d at 39.

D. Chapter 93A Claims Concerning Labeling

The Chapter 93A claims concerning Extra Stout's labelling, however, are precluded under §3, which provides a "safe harbor" for conduct "otherwise permitted under laws as administered by a regulatory board or officer acting under statutory authority of the commonwealth or of the United States."

_____

address the standard applicable to Chapter 93A claims for deceit. See Def's Memo. at 21 (citing Edlow, 688 F. 3d at 39). Therefore, the court assumes for the purposes of this motion that if the challenged statements could reasonably be deemed deceptive under Chapter 93A, they may also be deemed common-law misrepresentations. Any argument that the misrepresentation claim should be dismissed even though the Chapter 93A claim survives is waived and must be address, if at all, on a motion for summary judgment. See United States v. Zannino, 895 F. 2d 1, 17 (1st Cir. 1990).

As explained earlier, the TTB approved the allegedly deceptive labels on Extra Stout's bottles. Compare Def's Ex. 1 with Am. Compl. at ¶¶20-23, 35-37, Exs. 1-5. As also explained earlier, the TTB's approval establishes that the agency found that the labels on Extra Stout's bottles identify the "place of production" of Extra Stout without "creat[ing] a misleading impression." 27 C.F.R. §25.142(a); 27 C.F.R. §7.29(a)(1). In particular, to issue the COLA, the TTB was required to find that the brand name[10] and the other statements on the labels do not "convey[] [an] erroneous impression[] as to the...origin...or other characteristics of the product." Id. at §7.23. It was also required to find that there were no statements that were "false or untrue in any particular, or that...tend[ed] to create a misleading impression." 27 C.F.R. §§7.29(a)(1). The TTB knew that Extra Stout was brewed in Canada when it approved the labels. The COLA includes the label on the side of the bottle indicating that Extra Stout is a "Product of Canada," and the COLA Detail acknowledges that Extra Stout's "Origin" is "Canada." See Def. Exs. 2, 1. Therefore, the statements on Extra Stout's bottles, including "Traditionally Brewed St. James's Gate Dublin" next to "Imported Guinness Extra Stout," were approved as not misleading with respect to Extra

---

[10] The brand name appearing on Extra Stout's label is "Guinness." Exhibit 1 at §5.

36

Stout's origin "under laws as administered by a[n]...officer acting under statutory authority of...the United States," pursuant to 27 U.S.C. §205(e), and cannot create liability under Chapter 93A §3.

Other courts have reached the same conclusion in similar circumstances. In Kuenzig, the Eleventh Circuit held that labels on lunch meat products, which allegedly "misled consumers into believing that...[the] products contained fewer fat-calories than they actually did" were entitled to safe harbor under Florida consumer protection law. 505 Fed. App'x at 939. The court found that the "labels were specifically permitted by federal law [because they] complied with federal regulations regarding the use of percentage fat-free claims and were approved by Food Inspection and Safety Service prior to their commercial use." Id. In Cruz, the district court found that a COLA exempted a label, which allegedly represented that a beer was healthier than it was, from claims under California's consumer protection statute. 2015 WL 3561536, at *3-4. The court relied on 27 C.F.R. §7.29(a)(1) and a COLA issued by the TTB to find that the allegedly deceptive statements on the labels were approved pursuant to federal law and, therefore, entitled to safe harbor. Id. at *4.

At least one court has suggested that a COLA does not entitle TTB-approved labels to safe harbor because COLAs do not carry the "force of [federal] law" necessary to preempt state law. Hoffman

37

v. Fifth Generation, Inc., 2015 WL 5440330, at \*7 (S.D. Cal. 2015)(citing Von Koenig v. Snapple Beverage Corp., 713 F. Supp. 2d 1066, 1076 (E.D. Cal. 2010)). The court applied the standard adopted by the First, Third, and Ninth Circuits for whether a federal administrative rule preempts state law. Those courts have held that "[c]reation of federal law should demand at least the same formality for purposes of preemption as it does for purposes of Chevron deference," meaning that it must satisfy "the standard set forth in United States v. Mead Corp., 533 U.S. 218, 234 (2001)."[11] Reid v. Johnson & Johnson, 780 F. 3d 952, 964 (9th Cir. 2015); Fellner v. Tri-Union Seafoods, LLC, 539 F.3d 237, 245 (3d Cir. 2008); see also Good v. Altria Group, Inc., 501 F. 3d 29, 50-53 (1st Cir. 2007), aff'd 555 U.S. 70, 88-91 (2008). The court in Hoffman found that COLAs do not have the "force of law" because they are not "the result of a formal deliberative process akin to

---

[11] The Court held that courts are only required to defer to an agency's interpretation of the statute it administers "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." Id. at 226-27. The Court held that "[i]t is fair to assume generally that Congress contemplates administrative action with the effect of law when it provides for a relatively formal administrative procedure tending to foster the fairness and deliberation that should underlie a pronouncement of such force." Id. at 230. Nevertheless, even in the absence of a formalized process, other factors may justify the application of Chevron deference. See Barnhart v. Walton, 535 U.S. 212, 222 (2002).

notice and comment rulemaking or adjudication." Hoffman, 2015 WL 5440330 at *7. The court in Cruz disagreed, holding that the COLA application process was a "relatively formal administrative procedure" sufficient to warrant deference and entitling the approved labels to safe harbor. 2015 WL 3561536, at *3-4.

Hoffman does not change the court's conclusion that the TTB's approval of Extra Stout's labels entitles them to safe harbor protection under Chapter 93A, §3. As the court stated in Reid, whether an agency action carries the "binding and exclusive force of federal law" in a particular situation depends on Congress's intent. Reid, 780 F. 3d at 964; Good, 501 F. 3d at 33-34 (stating that preemption question turned on Congress's intent). In Mead, Reid, Fellner, and Good, the courts found that Congress did not intend to authorize agencies to promulgate legislative "rules carrying the force of law," binding on all regulated parties, through informal guidance documents or adjudicatory rulings that "do not bind more than the parties to the ruling." Mead, 533 U.S. at 232; see also Fellner, 538 F. 3d at 245; Reid, 780 F. 3d at 964-65 (finding that "Congress did not intend to create a...means of rulemaking by means of letters tentatively stating the FDA enforcement discretion"). Good involved an FTC consent decree with a third party, American Tobacco. The First Circuit held that the consent decree, which did not follow formal rulemaking procedures and could not be enforced against non-parties, did not create an

official agency policy sufficient to preempt Maine Unfair Trade Practice Act against Phillip Morris or to "authorize" Phillip Morris's practices under the identical safe harbor provision of that act. See 501 F. 3d at 50-52, 55-57.

In contrast, whether Congress authorized the TTB to promulgate generally applicable rules of law through the COLA approval process is not at issue here. Chapter 93A §3 requires at most that Congress authorized the TTB, through its process, to affirmatively "permit" defendants to distribute Extra Stout. The TTB regulations, promulgated pursuant to the FAAA, explicitly gives the TTB the authority to determine that a label is not deceptive and to grant an individual company the required permission to market its product. See 27 C.F.R. §§7.41, 25.142(e). Specifically, the COLA permits Extra Stout to be sold in interstate commerce where it would otherwise be prohibited under 27 U.S.C. §205(e). In addition, neither the statute nor the regulations require the TTB to follow procedures more stringent than it employed in this case to issue the COLA. Therefore, the COLA has the force of law required to give defendants' conduct safe harbor under Chapter 93A, §3. In any event, plaintiff has not argued otherwise. The issue is, therefore, waived. See Zannino, 895 F. 2d at 17.

Instead, plaintiff argues that the TTB did not in fact approve the conduct alleged to be misleading. He argues that, as in Marty,

his "claims [] are not [solely] based on the labels approved by the TTB, but rather on the representations contained on the cartons" in which Extra Stout is packaged, as well as on "the defendant's other representations and omissions." 43 F. Supp. 3d at 1345. In Marty, the plaintiff challenged statements on a beer's bottles, cartons, and online advertisements as deceptively representing that the beer was brewed in Germany, rather than the United States. Id. at 1345. The district court held that Florida's safe harbor doctrine did not shield labels affixed to the beer's carton because the TTB had only approved the labels on the bottles. Id. at 1344-45. The labels on the carton, unlike those on the bottle, displayed the words "German Quality," which made them more deceptive. Id. at 1345 n. 1344. In addition, the amended complaint alleged "that part of the label approved by the TTB, including the 'Product of USA' disclaimer, [was] not visible to the consumer at the time of purchase...unless a bottle [was] removed [from the carton] and examined" to reveal the disclaimer. Id. at 1344.

The court in Marty did not address the fact that a COLA represents the approval of not only the statements in the label, but also of statements on the "carton, case, or other covering of the container." 27 C.F.R. §7.21; see also 27 U.S.C. §205(e) (prohibiting the sale of "any...malt beverages in bottles, unless such products are bottled, packaged, and labeled in conformity

with [the] regulations...with respect to packaging, marking, branding, and labeling and size and fill of container").

In any event, unlike in Marty, the challenged labels on Extra Stout's bottling are identical in all material respects to the challenged labels on the packaging, and plaintiff's objections to each are identical. Compare Am. Compl. at ¶¶20-21 with ¶¶22-23. Plaintiff does allege that the small print "Product of Canada" disclaimer on the back of the bottles is hidden by the outer packaging. See id. at ¶36. However, as plaintiff acknowledges, the presence of such a small-print disclaimer on the side of the bottle is not material to whether the large-print representations on the front are deceptive. See Williams, 552 F. 3d at 939 (holding that "reasonable consumers [are not] expected to look beyond misleading representations on the front of the box to discover the truth from the ingredient list in small print on the side of the box"). The TTB determined that the challenged representations on the front of the bottles are not deceptive. Therefore, plaintiff's Chapter 93A claims concerning identical labels on the bottles and their cartons are barred.

However, the TTB did not approve the clearer statement on defendants' website that "all the Guinness sold in...North America is brewed in Ireland at the historic St. James's Gate brewery in Dublin." Am. Compl. at ¶13. Therefore, §3 does not preclude the Chapter 93A claims with respect to that statement.

This means that Counts III and IV must be dismissed to the extent that they rely on the labeling of Extra Stout's bottles and packaging. In addition, in Counts V and VI, plaintiff alleges that defendants' violated Chapter 93A for the additional reason that their statements violated Mas. Gen. Laws Chapter 94, §187 and one of its implementing regulations, 105 C.M.R. §520.115(A). As explained earlier, violations of Massachusetts statutes or regulations meant to protect public health or welfare against unfair or deceptive conduct are also violations of Chapter 93A. See Klairmont, 465 Mass. at 174. However, both Chapter 94, §187 and 105 C.M.R. §520.115(A) concern only statements on a product's label. See Pl. Opp. at 11, 13-14. Because the TTB found that Extra Stout labels are not deceptive, Counts V and VI must be dismissed in their entirety.

E. Unjust Enrichment

The equitable doctrine of unjust enrichment entitles a plaintiff to restitution for any benefit knowingly retained by the defendant at his expense when it would be inequitable for the defendant to retain that benefit without paying the plaintiff. See Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 552 F. 3d 47, 57 (1st Cir. 2009). However, "unjust enrichment serves only as an equitable stopgap for occasional inadequacies in contractual remedies at law." Shaulis, 865 F. 3d at 16. "[A] party with an adequate remedy at law cannot claim unjust enrichment." Id. The

43

claims for misrepresentation and violations of Chapter 93A provide available remedies, even though some of them must be dismissed. Id. ("Although [plaintiff] argues that, if her other claims are dismissed, she effectively has no adequate remedy, this argument misapprehends the relevant law. It is the availability of a remedy at law, not the viability of that remedy, that prohibits a claim for unjust enrichment."). Therefore, the unjust enrichment claim must be dismissed.

F. Injunctive Relief

Plaintiff lacks standing to seek an injunction because he does not allege that he is likely to purchase Extra Stout in the future. Therefore, he does not allege a "real and immediate threat of future injury," as required to establish standing for injunctive relief. O'Shea v. Littleton, 414 U.S. 488, 496 (1974); see also McNair v. Synapse Group, Inc., 672 F. 3d 213, 224 (3rd Cir. 2012)(former customers of magazine did not have standing to seek injunction against magazine's deceptive subscription-renewal practices because plaintiffs "d[id] not allege that they intended to subscribe [to the magazine] again"); Derby v. Jos A. Bank Clothiers, Inc., 2014 WL 7361023, at *7-8 (D. Mass. 2014)("If plaintiff is under no threat whatsoever of future injury, he cannot maintain a claim for injunctive relief."); Anderson v. Hain Celestial Group., Inc., 87 F. Supp. 3d 1226, 1234 (N.D. Cal. 2015). ("Plaintiff does not allege that she will repurchase any of

Defendant's...products[.] Thus, there is no opportunity for Plaintiff to lose the benefit of her bargain once again, and she does not have standing to assert a claim for injunctive relief.").

Chapter 93A, §9 expressly authorizes injunctive relief. Some courts have relied on the policies underlying comparable consumer protection statutes to find a plaintiff may seek injunctive relief on behalf of a consumer class as long as the defendant's conduct is ongoing. See Koehler v. Litehouse, Inc., 2012 WL 6217635 (N.D. Cal. Dec. 13, 2012)(holding that to deny standing plaintiff because he does not intend to purchase the product in the future "would eviscerate the intent of the...legislature in creating consumer protection statutes because it would effectively bar any consumer who avoids the offending product from seeking injunctive relief"). However, the Massachusetts legislature "cannot override Article III standing requirements." Derby, 2014 WL 7361023, at *8; Anderson, 87 F. Supp. 3d at 1234 (stating that "potential 'evisceration' of the intent underlying a statutory scheme may be unfortunate, but it is not a valid reason to confer standing in federal court when the paramount constitutional obligation is otherwise left unsatisfied"). Because plaintiff does not satisfy Article III's requirement of an imminent injury, his prayer for injunctive relief must be dismissed.

## G. Declaratory Judgment

In Count VII, Plaintiff requests "a declaration as to whether Defendants representations, advertising, labeling, marketing and/or selling of Extra Stout, as described [in the Amended Complaint], are or were in violation of Massachusetts law, Massachusetts Regulations and/or Federal law and regulations." Am. Compl. at ¶197-200. Plaintiff states in his opposition that he seeks a declaration concerning "whether [defendants] can lawfully advertise [their] products as having been 'traditionally Brewed' in Dublin, Ireland when, in reality, the [Amended Complaint] alleges the products were brewed in Canada in violation of: M.G.L. c. 93A; 940 CMR 3.02; M.G.L. c. 94, § 187; 940 CMR 3.16(3); and 105 CMR 520.115" and the "common law principle of misrepresentation and unjust enrichment." Pl. Opp. at 10. As plaintiff acknowledges, all of these violations "have been separately alleged" in the Amended Complaint. Id. at 10.

The declaratory judgment claim, therefore, "merely duplicates" the other counts and is "subject to dismissal." Young v. Wells Fargo Bank, N.A., 717 F. 3d 224, 237 (1st Cir. 2013); see also Swartz v. KPMG LLP, 476 F.3d 756, 766 (9th Cir.2007) (holding that "[t]o the extent [plaintiff] seeks a declaration of defendants' liability for damages sought for his other causes of action," the claim must be dismissed as "merely duplicative").

46

### H. REQUEST TO STRIKE CLASS ALLEGATIONS

Plaintiff seeks to represent a class of "all consumers residing in the United States who purchased Extra Stout" at a retail location or restaurant "within the period that Extra Stout was represented to have been manufactured, brewed, sourced, bottled and/or imported from the St. James's Gate Brewery, Dublin, Ireland, when it was not manufactured, brewed, sourced, bottled and/or imported from the St. James's Gate Brewery, Dublin, Ireland." Compl. at ¶68.

Defendants requests that the court strike the class allegations under Federal Rule of Civil Procedure 23(d)(1)(D) because plaintiff alleges an impermissible "fail safe" class, or a class that "is defined so that whether a person qualifies as a member depends on whether the person has a valid claim on the merits." Messner v. Northshore Univ. Health System, 669 F.3d 802, 825 (7th Cir. 2012). The First Circuit has stated in dicta that "fail-safe" class definitions can be unfair to the defendants, and are "inappropriate," because they make it "virtually impossible for the Defendants to ever 'win' the case, with the intended class preclusive effects." In re Nexium Antitrust Litig., 777 F.3d 9, 22 (1st Cir. 2015)(stating further that "a fail-safe class is prohibited because it would allow putative class members to seek a remedy but not be bound by an adverse judgment-either those class members win or, by virtue of losing, they are not in the class and

47

are not bound.")(citing Young v. Nationwide Mut. Ins. Co., 693
F.3d 532, 537 (6th Cir. 2012)).

However, district courts must exercise "caution when striking
class action allegations based solely on the pleadings," in part
"because it requires a reviewing court to preemptively terminate
the class aspects of...litigation, solely on the basis of what is
alleged in the complaint, and before plaintiffs are permitted to
complete the discovery to which they would otherwise be entitled
on questions relevant to class certification." Manning v. Boston
Medical Center Corp., 725 F. 3d 34, 59 (1st Cir. 2013).
"Accordingly, a court should typically await the development of a
factual record before determining whether the case should move
forward on a representative basis," unless "it is obvious from the
pleadings" that it cannot. Id. at 59-60. This is especially true
because issues of over-breadth and fail-safe definitions "can and
often should be solved by refining the class definition rather
than by flatly denying class certification on that basis." St.
Louis Heart Ctr., Inc. v. Forest Pharm., Inc., 2013 WL 1076540, at
*6 (E.D. Mo. Mar. 13, 2013); see also Campbell v. First Am. Title
Ins. Co., 269 F.R.D. 68, 74 (D. Me. 2010)("A court may, in an
exercise of its discretion, revise a proposed class definition to
avoid the problem of a fail-safe class."). In Lindsay Transmission,
LLC v. Office Depot, Inc., the single case cited by defendants in
which a district court struck class allegations because the

plaintiff proposed a "fail-safe" class, the parties had already engaged in substantial discovery concerning the class's claims. 2013 WL 275568, at *4-5 (E.D. Mo. Jan. 24, 2013).

Defendants assert that individuals are only included within the present class definition if Extra Stout "was [mis]represented to that specific individual as having been brewed in Ireland" and, therefore, that the class is a "fail-safe" class. Def. Memo at 25. Plaintiff disagrees, but proposes to narrow the class to people who purchased Extra Stout after a defined start date, December 15, 2011, until the date on which defendants stopped falsely labelling Extra Stout as brewed in Ireland. Pl. Opp. at 11 n. 24. In reply, defendants proposed that plaintiff "provide the end date for the class as the date that [production of Extra Stout] was moved back to St. James's Gate, Dublin." Def. Reply at 10. This exchange indicates that the parties are likely to resolve their disagreement concerning the proper scope of the class definition after they have conferred with the benefit of this Memorandum and Order and, if necessary, limited discovery concerning when defendants began selling Ireland-brewed Extra Stout in the United States. Therefore, the court is denying the request to strike the class allegations without prejudice.

V.   ORDER

In view of the foregoing, it is hereby ORDERED that:

1.    Plaintiff's Motion to Strike (Docket No. 22) is DENIED.

2. Defendants' Motion to Dismiss (Docket No. 17) is DENIED as to Count I, alleging misrepresentation, and as to Counts III and IV to the extent that they allege that statements on defendants' website violated Mass. Gen. Laws Chapter 93A. The Motion to Dismiss is ALLOWED as to Count II, with respect to Counts III and IV to the extent that they allege the statements on Extra Stout's bottle and carton labels violate Chapter 93A, and as to the remaining counts in their entirety. The prayers for injunctive and declaratory relief are also DISMISSED.

3. A scheduling conference shall be held on April 18, 2018, at 3:00 p.m. The parties shall, in the Joint Statement required under Rule 16.1(d) of the Local Rules for the United States District Court for the District of Massachusetts, state whether they have reached an agreement concerning whether the class definition should be amended prior to discovery, and if so, how it should be amended. If they have not reached an agreement, they shall explain their respective positions.

_____
UNITED STATES DISTRICT JUDGE