**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| |
|---|
| KIERAN O'HARA, on behalf of himself and all other similarly situated individuals, |
| Plaintiff, |
| v. |
| DIAGEO BEER COMPANY USA & DIAGEO NORTH AMERICA, INC. |
| Defendants. |

**Case No. <u>15-14139</u>**

**DEFENDANTS DIAGEO BEER COMPANY USA & DIAGEO NORTH AMERICA'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO EXCLUDE <u>OPINION OF PLAINTIFF'S EXPERT STEFAN BOEDEKER</u>**

**TABLE OF CONTENTS**

I.     INTRODUCTION ...................................................................................................1

II.    BACKGROUND ...................................................................................................2

       A.    O'Hara's Class Certification Allegations ..................................................2

       B.    Boedeker's Report .......................................................................................3

             a.    Overview of report ...........................................................................3

             b.    Boedeker's hypothetical study ........................................................4

             c.    The methodology underpinning the conjoint survey .......................5

             d.    Findings and conclusions .................................................................8

III.   ARGUMENT .........................................................................................................8

       A.    Legal Standard ...........................................................................................8

       B.    The illusory nature of Boedeker's hypothetical survey renders it unreliable. ............10

       C.    What little we do know about Boedeker's methodology is disqualifying. .................13

             a.    Boedeker's use of "materially different versions" of claims has been rejected. ...............13

             b.    Boedeker's failure to consider supply-side factors or real world pricing data has been rejected. ...............15

             c.    Boedeker's methodology suffers from focalism bias .......................17

IV.    CONCLUSION ...................................................................................................20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Agricultural Chemicals Antitrust Litigation*,
  No. Civ. A. 94-40216, 1995 WL 787538 (N.D. Fla. Oct.23, 1995) ......................................11

*Algarin v. Maybelline, LLC*,
  300 F.R.D. 444 (S.D. Cal. 2014) ........................................................................................17

*Am. Honda Motor Co. v. Allen*,
  600 F.3d 813 (7th Cir. 2010) ..............................................................................................10

*Apple, Inc. v. Samsung Elecs. Co*.,
  2014 WL 976898 (N.D. Cal. Mar. 6, 2014)........................................................................15

*In re Blood Reagents Antitrust Litigation*,
  783 F.3d 183 (3d Cir. 2015)................................................................................................10

*Brazil v. Dole Packaged Foods, LLC*,
  2014 WL 5794873 (N.D. Cal. Nov. 6, 2014) ......................................................................19

*Campbell v. Nat'l R.R. Passenger Corp.*,
  311 F. Supp. 3d 281 (D.D.C. 2018).....................................................................................12

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013)...........................................................................................................9, 12

*In re ConAgra Foods, Inc.*,
  302 F.R.D. 537 (C.D. Cal. 2014) ........................................................................................12

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993).......................................................................................................passim

*Davidson v. Apple, Inc.*,
  16-CV-04942-LHK, 2019 WL 2548460 (N.D. Cal. June 20, 2019) ....................................14

*DeRosa v. Massachusetts Bay Commuter Rail Co.*,
  694 F. Supp. 2d 87 (D. Mass. 2010) .....................................................................................9

*In re Dial Complete Mktg. & Sales Practices Litig.*,
  312 F.R.D. 36 (D.N.H. 2015) ..............................................................................................13

*Dukes v. Wal-Mart, Inc.*,
  222 F.R.D. 189 (N.D. Cal. 2004).........................................................................................18

*Ellis v. Costco Wholesale Corp.*,
  657 F.3d 970 (9th Cir. 2011) ...............................................................................................10

*First Marblehead Corp. v. House*,
    541 F.3d 36 (1st Cir. 2008) ......................................................................9

*In re General Motors LLC Ignition Switch Litig.*,
    407 F. Supp. 3d 212 (S.D.N.Y. 2019) .............................................15, 16

*Hadley v. Kellogg Sales Co.*,
    324 F. Supp. 3d 1084 (N.D. Cal. 2018) ..................................................16

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999) ..................................................................................9

*In re Med. Waste Servs. Antitrust Litig.*,
    No. 2:03MD1546 DAK, 2006 WL 538927 (D. Utah Mar. 3, 2006) ......11

*Messner v. Northshore Univ. Health System*,
    669 F.3d 802 (7th Cir. 2012) ..................................................................10

*Miller v. Fuhu Inc.*,
    No. 2:14-cv-06119-CAS-AS, 2015 WL 7776794 (C.D. Cal. Dec. 1, 2015) .........................13

*Natchitoches Par. Hosp. Serv. Dist. v. Tyco Int'l, Ltd.*,
    247 F.R.D. 253 (D. Mass. 2008) ..................................................10, 11, 12

*In re NJOY, Inc. Consumer Class Action Litig.*,
    120 F. Supp. 3d 1050 (C.D. Cal. 2015) .................................................15

*Pecover v. Elec. Arts Inc.*,
    C 08-2820 VRW, 2010 WL 8742757 (N.D. Cal. Dec. 21, 2010) ...........9

*Randolph v. J.M. Smucker Co.*,
    303 F.R.D. 679 (S.D. Fla. 2014) ............................................................13

*Saavedra v. Eli Lilly & Co.*,
    No. 2:12-cv-9366-SVW, 2014 WL 7338930 (C.D. Cal. Dec. 18, 2014) .........................13, 15

*Sher v. Raytheon Co.*,
    419 F. App'x. 887 (11th Cir. 2011) ......................................................10

*Singleton v. Fifth Generation, Inc.*,
    No. 515CV474BKSTWD, 2017 WL 5001444 (N.D.N.Y. Sept. 27, 2017) .....................10, 17

*Townsend v. Monster Beverage Corp.*,
    303 F. Supp. 3d 1010 (C.D. Cal. 2018) ..................................... *passim*

*Unger v. Amedisys Inc.*,
    401 F.3d 316 (5th Cir. 2005) ..................................................................10

*United States v. Sandoval-Mendoza*,
    472 F.3d 645 (9th Cir. 2006) ....................................................................9

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ................................................................................................9, 10

*Wallace v. Countrywide Home Loans Inc*.,
  No. SACV 08-1463-JST, 2012 WL 11896333 (C.D. Cal. Aug. 31, 2012) ...........................18

**Rules**

Fed. R. Civ. P. 23 .................................................................................................................9

Fed. R. Civ. P. 23(a) ...........................................................................................................10

Fed. R. Civ. P. 23(b) ...........................................................................................................10

Fed. R. Evid. 702 ........................................................................................................ *passim*

**Other Authorities**

Häubl, G., Dellaert, B. G., and Donkers, B. "Tunnel Vision: Local Behavioral
  Influences on Consumer Decisions in Product Search." ........................................................17

Defendants Diageo Beer Company USA and Diageo North America, Inc. (collectively, "Diageo"), in accordance with Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), respectfully submit this memorandum of law in support of Diageo's motion to exclude the opinion of Plaintiff Kieran O'Hara's ("O'Hara") proposed expert, Stefan Boedeker's ("Boedeker"), including Boedeker's testimony and report.

## I.      INTRODUCTION

O'Hara's sole expert, Stefan Boedeker, submits an opinion in support of class certification that is, by his own admission, pure hypothesis.  What his report calls "conclusions" are actually equivocal promises of possible future findings derived from a study that Boedeker has not yet designed, much less conducted.  Even so, what little information we do have about the substance of his hypothetical future study is already disqualifying under *Daubert* and Rule 702. As numerous courts have concluded, one cannot simply circumvent *Daubert* and Rule 702 by submitting an inchoate analysis that merely pledges to do more, but later.

Putting aside the obvious conjectural problems with his non-opinion opinion, Boedeker's putative future study—a theoretical conjoint survey—will also feature a litany of methodological flaws, each one of them fatal to reliability.  For one, the report suggests his study will not test the actual claims made on Guinness Extra Stout's ("GES") packaging and labels—a gambit Boedeker has already tried, and failed, in a prior false advertising action, styled *Townsend v. Monster Beverage Corp.*, 303 F. Supp. 3d 1010 (C.D. Cal. 2018).  In *Monster*, Boedeker submitted an expert report in support of class certification derived from a survey that (i) featured altered versions of the disputed claims and (ii) failed to analyze the central question of how consumers interpreted those claims. The result in *Monster* was an order striking three-fourths of his opinion. *Id*. Yet, it is the same thing his report promises to do here.

Employing *Monster's* already-rejected methodology is not the only problem with Boedeker's proposal, however. Boedeker's report also suggests he will apply *several other* previously-rejected methodologies, including a damages model that ignores supply-side factors and disregards real-world pricing data, and a conjoint survey that is tainted with focalism bias. Alone, any one of the preceding methodological flaws would be cause for exclusion of an expert's opinion as unreliable, regardless of whether the analysis is complete or not. Together, the law in this Circuit necessitates it.

In light of the foregoing, the Court should exclude the entirety of Boedeker's opinion as inconsistent with *Daubert*, its progeny, and Rule 702.

## II.     BACKGROUND

### A.  O'Hara's Class Certification Allegations

O'Hara's claims are largely premised on the "Traditionally Brewed" and "St. James's Gate, Dublin" language on GES labels and packaging, though that language really only appears on the GES 12 oz. bottle and 6-pack (the 12-pack's sealed carton packaging simply says "Imported" and "Product of Canada") *See* Compl. ¶¶ 20; 23; 26–29. To a lesser extent, O'Hara also challenges the representation on the Guinness Website FAQ (seen by, at most, a *de minimis* number of putative class members) that, "All the GUINNESS® sold in the UK, Ireland, and North America is brewed in Ireland at the historic St. James's Gate Brewery in Dublin." Compl. ¶¶ 12–13.

O'Hara seeks to certify two classes in connection with these claims: A nationwide class, consisting of individuals and entities in the contiguous continental United States who purchased GES within the class period, and a Massachusetts sub-class consisting of all individuals and entities who purchased GES in Massachusetts within the class period.

## B. Boedeker's Report

### a. Overview of report

In support of class certification, O'Hara submits the expert report of Stefan Boedeker. *See* Expert Report Of Stefan Boedeker In Support Of Plaintiff's Motion For Class Certification ("Report"), ECF No. 85-3 at § 1.1.  Boedeker's report says it does four things:

1. "Ascertain if it is possible to quantify economic losses to the Plaintiff and the members of the putative class … and if so, to provide a framework for the computation of class-wide damages";

2. "Explain and outline an economic model that enables the quantification of economic losses suffered by the Class as a result of having purchased [GES]";

3. "Explain and outline an empirical study to quantify the economic loss to consumers by assessing consumers' changes in choices and preferences in the absence of the alleged misrepresentation"; and

4. "Explain and outline a statistical methodology to calculate class-wide damages if the absence of the Claim or knowledge at the point of purchase that the Claim is false leads to a lower market demand with lower prices."

*Id*. at § 1.3.  But Boedeker's report accomplishes none of these things in a reliable way that will assist the trier of fact.

In preparing his report, Boedeker relied on just three documents from this case: (i) O'Hara's Revised Second Amended Complaint and Demand for Jury Trial, ECF No. 63; (ii) O'Hara's Second Amended Class Action Complaint, ECF No. 47; and (iii) the Court's March 30, 2019 Memorandum and Order, ECF No. 60, Report at Ex. B.  In other words, Boedeker did not review Diageo marketing materials, Boedeker Dep. at 105:3–5, Ex. 10, hereto ("I have not studied [Diageo's] marketing strategies"), nor did he review any deposition testimony, including O'Hara's. *Id*. at 43:2–6.  He also considered no other internal GES documents or communications, and no consumer complaints, opting instead for plaintiff's counsel's word about the facts in this case. *Id*. at 59:12–15; 132:3–7 (citing discussions with counsel as basis for opinion).[1]

---

[1] *See also* Expert Report of Keith R. Ugone, Ph.D., at 8-9, Ex. 1, hereto (listing 19 different failures in preparing report admitted by Boedeker at deposition).

### b.  Boedeker's hypothetical study

The crux of Boedeker's 45-page report (and what O'Hara relies on to show that damages in this case are purportedly subject to common proof) consists of about four pages describing a hypothetical choice-based conjoint survey. Report at § 4.2. While the report attempts to provide an *illustrative* example of the survey, the real one remains in Boedeker's head, as he admits he has neither designed nor conducted any part of it:

> **Q.** Okay.  But you don't know how you're going to design the study yet?
> **A.** No, the way -- how I design the study I will general -- I will have an exploratory survey if there's no research.  So I have figured out the steps, I haven't put in the details yet.
> **Q.** Okay.  Okay.  You know you could ask questions but you don't know what the questions are yet?
> **A.** In a -- in a very broad sense, yes, that's -- that's the. . . representation.

Boedeker Dep. at 135:12–136:3.  Contrary to O'Hara's representation that "the methodology will establish that each consumer who bought [GES] containing the false and misleading claims will have suffered a similar economic loss," ECF No. 85 at 20, Boedeker has no idea whether his putative survey will even show Diageo's alleged misrepresentations had any impact on consumer behavior at all. Compare the following:

> The methodology will establish that, absent the misrepresentations, there would exist a lower market demand for certain products; and therefore, the price of purchase would reflect lower prices for the subject product without the challenged misrepresentation.

ECF No. 85 at 19 (citing Report at 3, 18); and

> **Q.** So at this point though you don't know what the results of the conjoint analysis will be; is that correct?
> **A.** Without having conducted it, that's definitely true, yes.
> **Q.** Okay. And it's possible that the conjoint analysis will establish that the allegedly false statement had no impact on demand is that correct?
> **A.** I cannot rule it out. Again, I haven't done the study yet.

Boedeker Dep. at 27:15-28:3.[2]

---

[2] *See also id.* at 28:8-30:1; Comparison Chart at Ex. 2, hereto (comparing O'Hara's characterizations of Boedeker's report and testimony with language from the latter). Boedeker testified at deposition that: (i) he has not undertaken any survey work in this case; (ii) he "ha[s] not yet designed the actual survey to be used in the study"; and (iii) he has

     **c.   The methodology underpinning the conjoint survey**

     Despite its abstract nature, Boedeker's report states that his hypothetical conjoint survey will supposedly show "how the demand for a product changes when attributes and levels of attributes for that product change." Report at § 5, ¶ 132.  With regard to *how* he will arrive at that conclusion, Boedeker says the survey will feature certain attributes for respondents to consider, each discussed below.[3]  The report does not address *who* his hypothetical survey's respondents will be.  At deposition, he acknowledged he has not considered the issue. Boedeker Dep. 167:21–168:4; 169:1–6.[4]

     *The Proposed Beers:* The first attribute is "beer name," which features a list of what Boedeker calls "qualifying imported beers." Report at § 4.2.  Those beers are "GES, Heineken Lager, Grolsch Premium Lager, Stella Artois, Smithwick's Irish Ale, Bass Ale, Murphy's Irish Stout, and Moosehead Lager." *Id.*  At deposition, Boedeker explained he came up with the list of eight without any research. Boedeker Dep. at 131:22–132:7 ("**Q.** Now, did you just come up with these beers off the top of your head or did you do some research to come up with this list? **A.** I mean, **I had a list in my head**, I had some discussions with counsel and then one of my support staff just basically went through some websites and confirmed these [beers]") (emphasis added). Nothing in his report or testimony points to any reasoned basis for selecting these beers, ██████████

---

[3] not "conducted a conjoint analysis or a pilot survey or any empirical study like that" in this matter. *See* Boedeker depo at 123:17-19; 135:2-4; and 22:2-4, respectively; *see also id.* at 47:21-48:5 (**Q.** [H]ow about consumer surveys or conjoint studies you've designed, prepared or conducted that involve a Diageo entity in any way? **A.** [I] haven't done any … consumer studies as of yet. **Q.** Not even -- not just in connection with this case. Ever? **A.** For Diageo, no, I've never done any work for or -- or in a lawsuit in connection with Diageo.").

[3] At deposition, Boedeker hedges this significantly, stating he "has not made [a] final decision" on attributes and has not determined the associated levels of any of his proposed (and non-finalized) attributes. *See* Boedeker Dep., 125:17-21; Ugone Report at 20-21.

[4] ████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████ .

████████████████████████████████.[5] Indeed, Boedeker acknowledged

that he did not conduct any research into which beers compete with GES. *Id*. at 133:11–14 ("**Q.**

[Have] you reviewed any Diageo documents to determine who Diageo's competitors are? **A** [I]

have not yet done that.").  Boedeker then qualified that his list was not fixed, but fluid, stating that

he has yet to fully decide what beers he is going to use. *Id*. at 131:1–8 ("**Q.** So it sounds in your

report like you've actually made the decision?  **A.** I mean, I -- this is a list that I put together last

year when I wrote the report. Again, it may change, right? I could -- I could have maybe said will

be or possibly could be, right? But it's -- it's not something that I have yet fully decided on."). The

proposed survey, moreover, presents beer *brand* and beer *type* as a single attribute (e.g., Guinness

Extra Stout, Smithwick's Irish Ale, and Heineken Lager).  The report does not discuss how the

conjoint survey will be able to distinguish between consumers' preferences for beer brand (e.g.,

Guinness) versus type of beer (e.g., stout). Report at § 4.2.

*The Attributes of the Proposed Beers:* Boedeker's report also states that his hypothetical

survey will require respondents to "view a discrete number of choice sets, each containing a

combination of discrete numbers of attributes and a price" related to the eight qualifying beers.

Report at § 4.2, ¶125.  Those attributes will be brewery location, alcohol content, and calories. *Id*.

¶127. As with the list of qualifying imported beers, Boedeker provides no explanation for how or

why he chose those attributes among others. And Boedeker is equally equivocal about whether

those attributes will actually be the ones featured in his hypothetical survey. Boedeker Dep.,

125:17–21 ("**Q.** So does that mean that you haven't decided which attributes to use in -- in your

survey? **A.** I have not made that -- that final decision.").

Missing from these beer attributes, moreover, are the actual claims that O'Hara

challenges—i.e., "Traditionally Brewed" or "St. James's Gate, Dublin." The survey omits the

---

[5] ████████████████████████████████████████████
████████████████████████████████████.

"Traditionally Brewed" phrase altogether; and it will test a brewery location called "St James's Gate *Brewery*, Dublin, *Ireland*" (a different claim entirely). Report § 4.2, ¶125. As the snapshots of the actual label and Boedeker's illustrative show, the packaging O'Hara challenges does not include the words "brewery" or "Ireland":



Compl. ¶ 20.

| | Option 1 | Option 2 | Option 3 | Option 4 | Option 5 |
|---|---|---|---|---|---|
| **Beer Name** | Smithwick's Irish Ale | Guinness Extra Stout | Bass Ale | Stella Artois | Grolsch Premium Lager |
| **Beer Picture** | | | | | |
| **Alcohol by Volume (ABV)** | 4.5% | 4.0% | 5.0% | 4.5% | 5.0% |
| **Brewery Location** | St. Francis Abbey Brewery, Kilkenny, Ireland | St. James's Gate Brewery, Dublin, Ireland | Baldwinsville, New York, USA | Leuven, Belgium | The Grolsch Brewery, Boekelo, Netherland |
| **Calories per 12oz bottle** | 150 | 176 | 160 | 154 | 142 |
| **Price per 6-pack of 12oz bottles** | $8.59 | $9.39 | $6.99 | $7.79 | $7.79 |
| **Which option would you prefer?** | ○ | ○ | ○ | ○ | ○ |

Would you purchase this option?    ○ Yes    ○ No

*Source: Illustrative example.*

Report at § 4.2, Figure 10. Boedeker's survey will only seek to determine if changing the brewery location—as opposed to changing the packaging—leads to a "shift in the demand curve." *Id*. § 3.5.

Likewise, Boedeker will not include "taste" as an attribute for respondents to consider, despite the record evidence showing its overwhelming importance to consumers. Boedeker Dep. at 136:10–21 ("I haven't put taste in there" as it is "hard to objectively quantify and measure").

### d.  Findings and conclusions

Boedeker concludes his report by stating, "[I]t is possible to develop a theoretical model that shows how the demand for a product changes when attributes and levels of attributes for that product change [and] to design a choice-based conjoint study that elicits survey respondents to reveal their preferences for products with and without an attribute as so described to respondents." Report at §5, ¶ 132. "The theoretical model proposed," according to Boedeker, purports to measure "the difference between the price paid and the product value received by customers who purchased the Product where they never viewed the product's deceptive and misleading label." Report at § 5, ¶ 134.  Yet in determining a supposed "price premium," Boedeker agrees his model will disregard supply-side factors and instead will assume the supply curve stays constant. *See* Boedeker Dep. at 97: 9–17.  ("**Q.** Is the supply curve for Guinness inelastic? **A.** I -- I have not done a -- a -- a supply side analysis particularly with respect to elasticity of -- of the supply side, so I – I wouldn't know. **Q.** All right. Do you intend to do such study? **A.** No, I do not.").   In other words, Boedeker's methodology has the seller supplying at the same quantity, regardless whether demand shifts up or down, and by how much.[6]

### III.    ARGUMENT

### A.  Legal Standard

Under Federal Rule of Evidence 702, expert testimony is admissible only if it "will assist the trier of fact to understand the evidence or to determine a fact in issue."  To do this, the testimony must rest on "both . . . a reliable foundation" *and* be "relevant to the task at hand." *Daubert*, 509 U.S. at 597. "A reliable foundation" means "the knowledge underlying [the testimony] has a

---

[6] Boedeker opined that "[t]o fully compensate all consumers for their economic losses, it is necessary to find the price point on the [downward-shifted] demand curve that ensures that the same number of units that were sold in the actual world would also be sold in the but-for world."  Report at § 2.4, ¶ 45.  Interpreting or referring to the results of Boedeker's proposed methodology as a claimed "price premium" (i.e., a difference in market equilibrium prices), as O'Hara does (Class Cert. Mot. at 18), would necessarily assume a vertical supply curve (i.e., "perfectly inelastic" supply). However, Boedeker has not opined that the supply curve would be vertical in this case, has not provided support for such an assumption, and has testified he does not intend to do such a study.  And, of course, the likelihood the supply curve of beer is perfectly inelastic – meaning the same amount will be sold regardless of price – is zero.

reasonable basis in the knowledge and experience of the relevant discipline." *United States v. Sandoval-Mendoza*, 472 F.3d 645, 654 (9th Cir. 2006) (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999). The expert proffering the opinion must put forth a reliable methodology from which the proffered opinions were derived.  "Relevant to the task at hand" means testimony must be such that it "properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 597. Put differently, "the knowledge underlying [the testimony]" must have "a valid . . . connection to the pertinent inquiry." *Sandoval-Mendoza*, 472 F.3d at 654 (citation omitted). These standards apply both to scientific and non-scientific expert testimony.  *Kumho Tire*, 526 U.S. at 150 (noting that "there are many different kinds of experts, and many different kinds of expertise"). Failing either test is cause for exclusion.

In class actions, the party seeking certification must "affirmatively demonstrate" compliance with Rule 23's requirements, requiring a rigorous analysis of the allegations.  *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)).  In this connection, this court and others apply *Daubert's* strictures when expert testimony is offered to support a motion for class certification. *See e.g., DeRosa v. Massachusetts Bay Commuter Rail Co.*, 694 F. Supp. 2d 87, 99 (D. Mass. 2010) (finding no commonality where expert report was "based on a statistically insignificant response rate, meaning it does not 'rest[ ] on a sufficiently trustworthy foundation'" and thus "fail[ed] to meet the standard for admissibility") (citing *First Marblehead Corp. v. House,* 541 F.3d 36, 41 (1st Cir. 2008) and *Daubert*, 509 U.S. at 597).  As one court put it, "undertaking a full-blown *Daubert* analysis at the class certification stage makes a great deal of practical sense. . . . There would be scant, if any, benefit to the FRCP 23 inquiry if courts cannot ensure that competing testimony is relevant, admissible and in fact proffered by an expert." *Pecover v. Elec. Arts Inc.*, C 08-2820 VRW, 2010 WL 8742757, at *2 (N.D. Cal. Dec. 21, 2010)).  And though the Court "need not plunge into the weeds" about minor technical flaws in an expert's methodology, it must still consider whether "the

expert approach appears fundamentally flawed." *Natchitoches Par. Hosp. Serv. Dist. v. Tyco Int'l, Ltd.*, 247 F.R.D. 253, 270 (D. Mass. 2008).[7]

Boedeker is O'Hara's only expert. Without him, O'Hara has no proof of class damages. "When an expert's report or testimony is critical to class certification, we have held that a district court must make a conclusive ruling on any challenge to that expert's qualifications or submissions before it may rule on a motion for class certification." *Messner v. Northshore Univ. Health Sys.*, 669 F.3d 802, 812–14 (7th Cir. 2012) (citations omitted). Yet, even a passing glance at Boedeker's report reveals that his untested methodology and presumed conclusions are unreliable and irrelevant to the facts at hand. Under the rigorous analysis required by *Daubert*, Boedeker's opinion must be excluded.

**B. The illusory nature of Boedeker's hypothetical survey renders it unreliable.**

*First*, when an expert's proposed methodology is as preliminary as Boedeker's here, courts are free to reject it. *Natchitoches*, 247 F.R.D. at 273. While an expert "need not test or implement the model at [the class certification] stage, he must provide enough information to demonstrate its potential application to this case and Plaintiff's theory of liability." *Singleton v. Fifth Generation, Inc.*, No. 515CV474BKSTWD, 2017 WL 5001444, at *22 (N.D.N.Y. Sept. 27, 2017) (noting that methodologies are rejected under "framework" of *Daubert* and Rule 702 "when the[y] do not attempt to isolate the premium due only to the allegedly misleading marketing statement [because] consumers may pay a higher price for a product for many reasons that have nothing to do with

---

[7] Several other circuit courts have addressed the applicability of *Daubert* at the class certification stage and have likewise concluded the standard applies. *See, e.g., In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 187–88 (3d Cir. 2015) ("Expert testimony that is insufficiently reliable to satisfy the *Daubert* standard cannot 'prove' that the Rule 23(a) prerequisites have been met 'in fact,' nor can it establish 'through evidentiary proof' that Rule 23(b) is satisfied. Other courts of appeals have reached this conclusion."); *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011) (*citing Wal-Mart Stores, Inc.*,564 U.S. at 354 and stating, "In its analysis of Costco's motions to strike [expert testimony at class certification], the district court correctly applied the evidentiary standard set forth in *Daubert*"); *Am. Honda Motor Co. v. Allen,* 600 F.3d 813, 816 (7th Cir. 2010) (holding that a trial court "must perform a full *Daubert* analysis before certifying the class if the situation warrants"); *Sher v. Raytheon Co.*, 419 F. App'x. 887, 890 (11th Cir. 2011) (following the Seventh Circuit's approach); *Unger v. Amedisys Inc.*, 401 F.3d 316, 319 (5th Cir. 2005) (class certification decision "must be made based on adequate admissible evidence.").

specific advertising claims, including brand loyalty and product quality"). Thus, expert testimony should be rejected where the proposed methodology is "vague" and "lacks the sort of step-by-step detail necessary to evaluate whether the methodology is workable." *Id.*; *see also Natchitoches*, 247 F.R.D. at 273 (deferring decision to certify class in light of "[t]he preliminary nature of [plaintiffs' expert's] analysis," which "troubled the Court").

Here, although Boedeker gave some examples of things he *might* do, he expressly said he might *not* do any of those things. Thus, the sum total of his opinion is that he will perform some sort of conjoint analysis related to brewing location and consumer choice. This is simply too vague to meet the standards of Rule 702. As discussed in Section II, *supra*, Boedeker concedes that he has yet to decide how he will even design his study (much less whether it will give any credence to the notion that the claims at issue had any impact at all on consumer behavior). *See* Boedeker Dep. 27:15–28:3; 135:12–136:3. Because Boedeker has not set forth his proposed analysis in sufficient detail to even assess his proposed methodology, much less actually conduct that analysis, his report is unreliable and invalid. *See, e.g., In re Agric. Chems. Antitrust Litig.*, No. Civ. A. 94-40216, 1995 WL 787538, at *4 (N.D. Fla. Oct.23, 1995) (finding expert opinion "invalid" and denying class certification where expert "did no empirical study of whether impact could be proven on a class-wide basis. Nor did he do anything to inform himself about the [subject] industry"); *see also In re Med. Waste Servs. Antitrust Litig.*, No. 2:03MD1546 DAK, 2006 WL 538927, at *8 (D. Utah Mar. 3, 2006) (denying certification because expert's opinion was unreliable, holding, "Plaintiffs essentially opine that there is a method, they just do not know which method, and they have provided no evidence that any such method would actually work. It is simply not enough that Plaintiffs merely promise to develop in the future some unspecified workable damage formula. A concrete, workable formula must be described before certification is granted"). It is precisely this insubstantial, "maybe-I'll-try-this-or-maybe-I'll-try-that" methodology that should be excluded here. *Natchitoches*, 247 F.R.D. at 273 ("The preliminary nature of [the expert's] analysis, however,

is troubling. He has not rendered even a preliminary opinion based on preliminary evidence that Tyco's conduct has *in fact* violated the antitrust laws and resulted in an antitrust injury. Rather, he has outlined a general methodology: maybe-I'll-try-this-or-maybe-I'll-try-that.").

The danger of relying on Boedeker's undeveloped study is exacerbated here, where Boedeker has not looked at any record evidence or other factual information that would inform his expert report. He admits that he has done no empirical research in this case, considered no internal GES documents or communications, no marketing materials, no consumer complaints, and no deposition testimony. *See* Section II(B)(a), *supra*. Instead, he looked at all of two pleadings, an order, and what plaintiff's counsel told him about the case. "Such blind reliance on 'facts' provided by plaintiffs' counsel—combined with [the] failure to review other sources of information … renders his expert report unreliable." *Campbell v. Nat'l R.R. Passenger Corp.*, 311 F. Supp. 3d 281, 300 (D.D.C. 2018) (granting *Daubert* motion against experts who "assumed that plaintiffs' counsel accurately characterized the testimony … instead of independently reviewing that testimony himself") (internal quotations omitted).

Boedeker's opinion, essentially, is that it will somehow be possible to calculate class damages at some future date because he will develop a survey that says so. Put differently, Boedeker—having not examined any evidence in the case—is asking the court to *trust* that his undeveloped and unexplained methodology will do what he thinks. This cannot be sufficient under *Daubert* or Rule 702. Where an expert does not submit an actual, completed survey, and also fails to provide sufficient details about the hypothetical survey to show that it is based upon a reliable methodology, the expert opinion is not reliable and *Comcast* is not satisfied. *See In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 552 (C.D. Cal. 2014) (striking expert testimony under Rule 702 because it was 'so incomplete as to be inadmissible as irrelevant," adding that expert "provide[d]

no damages model at all. Although the methodologies he describes may very well be capable of calculating damages in this action, [the expert] has made no showing that this is the case").[8]

## C. What little we do know about Boedeker's methodology is disqualifying.

Even if the Court were to determine that the preliminary nature of Boedeker's report is sufficient, the barebones methodology Boedeker describes is fatally flawed in any event. Though O'Hara's certification motion takes considerable license in summarizing (and mischaracterizing) Boedeker's methodology and conclusions, the report says what it says—and several other courts have already rejected what Boedeker suggests he will do here. *See* Ex. 2 Comparison Chart (comparing O'Hara's characterizations with what Boedeker's report and testimony actually say).

### a. Boedeker's use of "materially different versions" of claims has been rejected.

First, Boedeker's hypothetical study is not relevant to this action because it does not even purport to test a claim actually made by Diageo. As discussed, his survey completely omits the "Traditionally Brewed" claim,[9] and tests only a brewery location called "St James's Gate Brewery, Dublin, Ireland"—a phrase that adds the words "Brewery" and "Ireland," which appear nowhere on any label or packaging at issue.[10] *See* Section II(B)(b), *supra*.

---

[8] *See also Saavedra v. Eli Lilly & Co.*, No. 2:12-cv-9366-SVW (MANx), 2014 WL 7338930, at *6 (C.D. Cal. Dec. 18, 2014) ("Finally, and perhaps most importantly, Mr. Hay has yet to design the survey and method he will use in his conjoint analysis. Mr. Hay has not yet collected any data from which he will determine the refund ratio."); *In re Dial Complete Mktg. & Sales Practices Litig.*, 312 F.R.D. 36, 78 (D.N.H. 2015) ("[P]laintiffs have provided insufficient detail regarding their proposed methodologies for calculating classwide damages. As Dial points out, plaintiffs' experts' damages methodologies are 'bare bones,' and set forth little detail concerning the 'significant conceptual, implementation, or data issues that would be encountered' if their approach were adopted." (citation omitted)); *Miller v. Fuhu Inc.*, No. 2:14-cv-06119-CAS-AS, 2015 WL 7776794, at *22 (C.D. Cal. Dec. 1, 2015) ("Moreover, the few concrete details Dennis has provided regarding how he will conduct his hypothetical survey are too vague for the Court to determine whether his survey is 'scientifically valid' and whether it 'properly can be applied to the facts in issue' in this case."); *Randolph v. J.M. Smucker Co.*, 303 F.R.D. 679, 698 (S.D. Fla. 2014) ("Other than the bald, unsupported assertion that this method will work, Plaintiff presents no hard-and-fast evidence that the premium is capable of measurement. [There is] no evidence on the actual model to be applied has been submitted, nor has Plaintiff demonstrated that the model will isolate premium received by the inclusion of the alleged misrepresentation.").

[9] Ignoring that O'Hara's entire argument is that Diageo supposedly "blatantly, yet falsely, advertis[ed] that all GES is "**Traditionally Brewed** St. James Gate Dublin." Class Cert. Mot. at 2 (emphasis added).

[10] Nor does Boedeker intend to test the actual claims at issue. *See, e.g.,* Boedeker Dep. 69:6-15; 73:1-6. ("**Q.** Is the attribute brewery location or is the attribute the language on the package? **A.** In the study I'm proposing it's the brewery location. … **Q.** And so does that assume that people understood that Guinness Extra Stout was brewed in

13

This is not the first time Boedeker proposes the same flawed methodology.  In *Monster*, for example, the court struck Boedeker's testimony regarding three of four statements on Monster energy drinks because Boedeker presented "materially different versions of the statements" in his survey. 303 F. Supp. 3d 1020.  "To be relevant to this action," the court reasoned, "*the words [Boedeker] is evaluating must in fact be the words on Defendants' labels.*"  *Id*. at 1024 (emphasis added).  In other words, "[i]n order to evaluate the price premium attributable to each of the alleged misstatements, Boedeker would have had to conduct a survey that included the *specific* statements themselves."  *Id*. (emphasis added).

Similarly, in *Davidson v. Apple, Inc*., No. 16-CV-04942-LHK (N.D. Cal.), a case involving a touchscreen defect on iPhones, the court rejected three of Boedeker's surveys, thrice denying class certification, because (i) Boedeker made several erroneous assumptions and generalizations in *completed* surveys, which rendered plaintiff's damages model inconsistent with their liability case and unable to measure class wide damages and (ii) because Boedeker, in the alternative, proposed a second, hypothetical survey that was simply too incomplete to be reliable. *Cf id.* at ECF No. 314 at 1 (Feb. 12, 2019) ("[T]he Court denied class certification based on three flaws found in Boedeker's survey methodology [including that] the survey only asked about a generic defect instead of a defect specifically affecting a phone's touchscreen.") and *Davidson*, 2019 WL 2548460, at *8 (N.D. Cal. June 20, 2019) (noting denial of second certification motion in part because "Plaintiffs' motion relies on a hypothetical survey that Boedeker had not yet conducted despite the fact that Plaintiffs, in their original class certification motion, relied upon a completed Boedeker survey," adding "how vast differences can exist between a hypothetical damages model and an actual damages model").

---

Ireland when in fact it wasn't? **A.** I mean, that will be just [the] two facts that I'm testing, right?  The conjoint [will] be designed in a way that consumers see the choice to having Guinness brewed in Ireland and one brewed [in] Canada and then it is really I – let the data do the talking, right?")

As with *Monster* and *Apple*, Boedeker's proposed conjoint study may eventually measure something, but it is not the alleged damages to the class caused by GES's labels or packaging. At best, the survey may measure the difference in willingness to pay between (i) a product that is known with all certainty by potential purchasers to have been brewed in "St. James's Gate Brewery, Dublin, Ireland," and (ii) a product that is known with all certainty by potential purchasers to have been brewed in "New Brunswick, Canada." Yet that is neither the relevant issue, consistent with O'Hara's theory of liability, nor helpful to the trier of fact here.

### b. Boedeker's failure to consider supply-side factors or real world pricing data has been rejected.

It is axiomatic that omitting supply-side factors artificially inflates the calculated price premium. *See Apple, Inc. v. Samsung Elecs. Co. Ltd.*, 11-cv-01846-LHK, 2014 WL 976898, at *11 (N.D. Cal. Mar. 6, 2014) ("The ultimate price of a product is a combination of market demand and market supply."); *see also In re NJOY, Inc. Consumer Class Action Litig.,* 120 F. Supp. 3d 1050, 1119 (C.D. Cal. 2015) (rejecting proposed conjoint analysis because expert "looked only to the demand side of the market equation, converting what is properly an objective evaluation of relative fair market values into a seemingly subjective inquiry of what an average consumer wants"); *Saavedra*, 2014 WL 7338930 at *5 (same).

In *In re Gen. Motors LLC Ignition Switch Litig.*, the court rejected Boedeker's opinion because he assumed that the supply curve (GM's willingness-to-sell the cars) would remain unchanged in the "but-for" world where the cars' defects were fully disclosed. 407 F. Supp. 3d 212 (S.D.N.Y. 2019). The failure to consider supply-side factors, the court reasoned, doomed plaintiff's class claims—particularly because measuring the market value of the cars was an element of damages (and market value relies on the supply curve). *Id.* Here, in determining a supposed "price premium," Boedeker's analysis similarly promises to omit supply-side factors and instead assumes the supply curve stays constant. *See* Boedeker Dep. at 97: 9–17. Put differently,

the model assumes the seller will continue supplying at the same quantity, regardless of whether demands shifts up or down, and by how much.  As Diageo's expert, Keith Ugone, Ph.D. explains:

> As Mr. Boedeker acknowledged, and as dictated by economic principles, market equilibrium prices (and any changes in market equilibrium prices) depend upon both supply and demand considerations.
>
> …
>
> From an economic perspective, because Mr. Boedeker will not account for supply-side considerations (i.e., will not estimate the slope of the supply curve), Mr. Boedeker's proposed methodology cannot estimate the claimed price premium (if any) associated with the Challenged Claims.  This deficiency cannot be cured in Mr. Boedeker's proposed methodology because he has testified that he does not intend to do a study of the characteristics of the supply associated with Guinness Extra Stout. Such observations and admissions by Mr. Boedeker make his proposed methodology both irrelevant and unreliable because, as [he] acknowledged, the **market equilibrium price (and any change in the market equilibrium price) depends upon both supply and demand considerations.**

Ugone Report at 23, 30 (emphasis added); *see also id.* at 32 ("WTP measures only a shift in the demand curve and not what the change in equilibrium price will be as the feature is added or enhanced.  [Generally,] WTP measure will overstate the change in equilibrium price and profits.").

As with most other market products, GES's price is determined by the intersection of supply and demand. And so, as in *General Motors*, Boedeker's failure to consider supply factors does not match real-world market conditions—a methodological flaw that, standing alone, is fatal to reliability. *See also Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1105 (N.D. Cal. 2018) ("[C]ourts have repeatedly rejected conjoint analyses that only measure demand-side [WTP]").

In addition, Boedeker's study rejects actual market prices for arbitrary ones.  Specifically, Boedeker states that, "in [his] opinion, a price range of $6.99 to $10.10" is appropriate for the conjoint survey.  Report at § 4.2, ¶ 129.  His "opinion," however, is based on two disparate prices he found on two retailers' websites in July 2019.  *Id*. at n.43.  He does not use price data from the relevant period (which would be before and just after September 2015, when Diageo shifted the brewing of GES from Canada or Ireland), nor any empirical data regarding the prices of GES and the other imported beer, whatsoever.  This, too, is fatal because one cannot assume a price premium

where retailers across every state, county, city, and neighborhood have different prices for the same product.  *See Singleton* 2017 WL 5001444 at *9 (denying class certification where market circumstances "lead to different retail stores independently setting different prices for the same products" and expert failed to explain how real-world pricing data would be used as part of conjoint analysis); *Algarin v. Maybelline, LLC*, 300 F.R.D. 444, 460–61 (S.D. Cal. 2014). ████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████.

It is precisely this flawed analysis that the Court must reject as gatekeeper under *Daubert*. *See* Ugone Report at 31-32 ("Mr. Boedeker is attempting to avoid the necessary estimation of a supply curve by assuming that the same amount would be sold regardless of the price. This is contrary to fundamental principles of economics as outlined in Mr. Boedeker's own report and fundamental principles of damages analysis which require the reconstruction of a but-for world.").

### c.  Boedeker's methodology suffers from focalism bias.

Boedeker's methodology, as described in his report, would also suffer from focalism bias, which occurs when respondents pay more attention to an attribute than they ordinarily would in the real world, thus increasing the subjective value they assign in the conjoint study.  *See Monster*, 303 F. Supp. 3d at 1049 (citing Häubl, G., Dellaert, B. G., and Donkers, B. "Tunnel Vision: Local Behavioral Influences on Consumer Decisions in Product Search." *Marketing Science*, 29(3):438–455 (2010) ("Focalism. Research in psychology has shown that people tend to overweight whatever information is most salient or most accessible at a particular moment and neglect other relevant considerations.").  As Boedeker readily admits, in the class action context, focalism problems are fatal to reliability. Boedeker Dep. at 120:13-14 (**Q.** And [focalism is] bad for a survey, right? **A.** That will skew the results, yes"); *see also Monster,* 303 F. Supp. 3d at 1049 (focalism bias in Boedeker's proposed survey rendered it "useless for the purpose of determining

price premiums attributable to the challenged statements"); *Wallace v. Countrywide Home Loans Inc.*, No. SACV 08-1463-JST, 2012 WL 11896333, at *3 (C.D. Cal. Aug. 31, 2012) (survey inadmissible where affected by presence of bias); *Dukes v. Wal-Mart, Inc.*, 222 F.R.D. 189, 197 (N.D. Cal. 2004) (excluding opinion where "[t]he survey instrument [was] biased on its face").

Here, Boedeker's report sets forth a handful of attributes respondents will consider in the hypothetical conjoint analysis, including beer brand, brewery location, calories, ABV, and price.[11] The *first* problem, as Boedeker admits, is that he picked these attributes arbitrarily. *See* Section II(C)(b), *supra*; *see also*, *e.g.*, Boedeker Dep. at 126:13-21 ("**Q.** Have you reviewed any of Diageo's documents? **A.** I have not yet. **Q.** Okay. Would reviewing Diageo's documents be helpful in determining which attributes are important? **A.** Again, as -- as it pertains to – to their own marketing strategies, market research, I -- I would deem that important, yes."). This means Boedeker's "proposed conjoint survey would cause participants to place greater weight on the five or six included (even if relatively less important) attributes in the conjoint survey … as compared to what they would at the time of purchase in the marketplace." *See* Ugone Report at 42-43.

But there is a *second*, more egregious problem: The evidence shows Boedeker's arbitrarily-selected attributes fail to include the most important purchase drivers for GES for each consumer. *See* Boedeker Dep. at 127:12–16 ("**Q.**  [There are] going to be a lot of other attributes you don't use, that if you had used, would also have some value to consumers, is that right? **A.** That is correct."). The most glaring omission, of course, is taste, which is the primary purchase driver for many consumers, including O'Hara:

> **Q.** How important was taste to your purchasing decisions?
> **A.** Important.
> **Q.** What would you say would be the most important factor in your purchasing decisions?
> **A.** Taste. And just what I like.

---

[11] Of course, Boedeker is not committed to these attributes.  But since this is all Diageo knows right now, it is all that can be addressed.

*See* Deposition of Kieran O'Hara at 39:16–22, Ex. 6, hereto; ███████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████ .

Failing to account for consumers' perceptions of taste and the other attributes that consumers actually consider important will create results that do not reflect consumers' actual purchasing decisions in the real world.  In a conjoint analysis—like the one here—that does not include actual, principle purchase drivers, respondents will assign more weight to the attributes listed and increase the importance of those attributes.  *See* Ugone Report at 44 ("Because Mr. Boedeker will (a) … omit several important beer attributes and demand driver[s] and (b) include brewery location over other relatively more important attributes and demand drivers, Mr. Boedeker's survey likely will result in survey respondents placing a greater value on (or paying more attention to) brewery location than they may have in the real world.").  This is fatal to reliability.  *See Monster*, 303 F. Supp. 3d at 1025; *see also Brazil v. Dole Packaged Foods, LLC*, 12-cv-01831-LHK, 2014 WL 5794873, at *11 (N.D. Cal. Nov. 6, 2014) *(*decertifying a class after plaintiff "failed to show how the [expert's model] controls for other variables affecting price" and "prices of competing products," adding that "it is not enough for [plaintiff] or [expert] to just say that the [damages model] controls for other factors; [plaintiff] must show the Court that the model can.").

Finally, only brewery location and price are varied during the survey, so respondents will likely understand that brewery location is the key issue—regardless of whether it is. *See* Ugone Report at 44 ("In the real world, (i) consumers may not have read or seen the Challenged Claims, (ii) consumers may not have interpreted the Challenged Claims as meaning that Guinness Extra Stout was brewed at St. James's Gate Brewery, Dublin, Ireland, and/or (iii) consumers may not have considered brewery location at all when making a purchase decision.  Thus, consumers' willingness to pay for brewery location (if any) as proposed to be estimated by Mr. Boedeker's

19

conjoint survey will not be a reliable measure of consumers' willingness to pay for the Challenged Claims in the real world (if any).").[12]  This is especially problematic here, where the record (which Boedeker did not consider) shows that brewery location is among the least important attributes to consumers. *See Id*; O'Hara Dep. at 158:18–20 ("**Q.**  Would you pay more for a beer based on where it was brewed? **A.** No, no.  No, I wouldn't."); *see also* Expert Report of Rebecca Kirk Fair, MBA, Ex. 3, hereto (demonstrating that including or excluding "Traditionally Brewed" and "St. James's Gate, Dublin" from the GES packaging does not cause consumers' willingness to purchase GES to vary).

Like in *Monster*, Boedeker will force the attention of respondents away from the pertinent attributes without any rhyme or reason.  These biases will make testimony drawn from his hypothetical survey fundamentally unreliable.  Accordingly, to the extent the Court even considers his report, it should find the report unreliable and inadmissible under *Daubert*.

## IV.    CONCLUSION

Boedeker's report falls short of the standard necessary for admissibility. For one, he simply has not done enough (really, *anything*) to render a relevant, reliable, or even helpful opinion.  And the facets of his opinion that are not entirely speculative are, as courts have conclusively determined, fundamentally unreliable. In light of the foregoing, Boedeker's report should be excluded, and Boedeker should be prohibited from testifying in connection with O'Hara's motion for class certification.

---

[12] As discussed, Boedeker is equivocal about whether he will vary the levels of the alcohol content or calories from the original composition of each respective beer in his future study. While his report says he will not, at deposition, he says otherwise. *Cf.* Report at § 4.2, ¶ 127 ("Respondents will also be able to review two additional attributes in their choice menu, the alcohol content (Alcohol by Volume, ABV) and the calories. However**, I *will not* vary the levels of those attributes** from the original composition of each respective beer.") *and* Boedeker Dep. at 234:4–10 (**Q.** Now, whatever attributes you ultimately choose, are you going to keep them all constant other than price and brew- -- brewery location? **A.** No, these were just examples. **I *could* vary the alcohol content**.") (emphasis added). Setting aside the tired "maybe-I'll-try-this-or-maybe-I'll-try-that" approach (which in itself is fatal to reliability), and taking the report at face value, if Boedeker does not vary certain attributes in his survey (e.g., alcohol content or calories), as he proposes in his report, survey respondents will likely be able to determine the purpose of the survey, which will further undermine its reliability.

Respectfully submitted

/s/Jacob Struck
Jacob J. Struck (BBO#680197)
HUNTON ANDREWS KURTH LLP
125 High Street, Suite 533
Boston, MA 02110
617-648-2751
JStruck@huntonAK.com

Leslie Kostyshak (*Pro Hac Vice*)
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037
202-778-2268
LKostyshak@HuntonAK.com

Samuel A. Danon (*Pro Hac Vice*)
HUNTON ANDREWS KURTH LLP
1111 Brickell Ave., Ste. 2500
Miami, FL 33131
305-810-2500
sdanon@hunton.com

Euripides D. Dalmanieras (BBO# 650985)
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210-2600
617-832-1000
EDalmani@foleyhoag.com

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

In accordance with Local Rule 5.2, I, Jacob Struck, hereby certify that this document

filed through the ECF System on April 20, 2020 will be sent electronically to the registered

participants as identified on the Notice of Electronic Filing.

/s/ *Jacob Struck*

21