KeyCite Blue Flag – Appeal Notification

Appeal Filed by   DENNIS MACDOUGALL, ET AL v. AMERICAN HONDA MOTOR CO., INC.,   9th Cir.,   October 15, 2020

2020 WL 5583534
Only the Westlaw citation is currently available.
United States District Court, C.D. California.

Dennis MACDOUGALL, et al.
v.
AMERICAN HONDA MOTOR CO., INC., et al.

Case No. SACV 17-1079 JGB (DFMx)
|
Filed 09/11/2020

**Attorneys and Law Firms**

Danielle L. Perry, Whitfield Bryson and Mason LLP, Gary E. Mason, Pro Hac Vice, Mason Lietz and Klinger LLP, Washington, DC, Jeffrey L. Osterwise, Pro Hac Vice, Lawrence Deutsch, Pro Hac Vice, Berger and Montague PC, Philadelphia, PA, Peretz Bronstein, Pro Hac Vice, Yitzchak E. Soloveichik, Pro Hac Vice, Bronstein Gewirtz and Grossman LLC, New York, NY, for Dennis MacDougall, et al.

Livia M. Kiser, King & Spalding LLP, Chicago, IL, Michael Brian Shortnacy, King & Spalding LLP, Los Angeles, CA, for American Honda Motor Co., Inc., et al.

**Proceedings: Order (1) GRANTING Defendants' Motion to Strike the Expert Testimony of Stefan Boedeker; (2) DENYING AS MOOT Defendants' Motion to Strike the Expert Testimony of Robert Parker; (3) GRANTING Defendants' Motion for Summary Judgment; (4) DENYING AS MOOT Plaintiffs' Motion for Class Certification; and (5) VACATING the September 14, 2020 Hearing (IN CHAMBERS)**

JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

*1 Before the Court are Defendants American Honda Motor Co., Inc. ("AHM") and Honda North America, Inc.'s ("HNA," and collectively with AHM, "Defendants") motion for summary judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56 ("MSJ," Dkt. No. 152) and motions to strike expert testimony ("MTS," Dkt. No. 151; "2d MTS," Dkt. No. 166). Also before the Court is Plaintiffs Dennis MacDougall, Ray Seow, Prabhanjan Kavuri, Richard Frick, Joseph Ryan Parker and Bryan Lentz's ("Plaintiffs") motion for class certification pursuant to Rule 23. ("MCC," Dkt. No. 147.) The Court finds these matters appropriate for resolution without a hearing. See Fed. R. Civ. P. 78; L.R. 7-15. After considering all papers filed in support of and in opposition to the matters, the Court GRANTS the 2d MTS, DENIES the MTS AS MOOT, GRANTS the MSJ, and DENIES the MCC AS MOOT. The hearing scheduled for September 14, 2020 is VACATED.

## I. BACKGROUND

**A. Procedural Background**
Plaintiffs filed this action against Defendants on June 21, 2017. ("Complaint," Dkt. No. 1.) In the Complaint, Plaintiffs allege twelve causes of action: (1) breach of express warranty; (2) breach of implied warranty of merchantability; (3) violations of the Magnuson-Moss Warranty Act ("MMWA"); (4) violations of the California Song-Beverly Consumer Warranty Act; (5) violations of Pennsylvania's Unfair Trade Practices and Consumer Protection Law; (6) violations of California's Consumer Legal Remedies Act; (7) violations of California's Unfair Competition Law; (8) violations of New Jersey's Consumer Fraud Act; (9) violations of Florida's Deceptive and Unfair Trade Practices Act; (10) equitable injunctive and declaratory relief; (11) declaratory relief under the Declaratory Judgment Act; and (12) unjust enrichment. (Id.)

On December 4, 2017, U.S. District Judge Andrew J. Guilford granted-in-part and denied-in-part Defendants' motion to dismiss the Complaint. ("Order to Dismiss," Dkt. No. 53.) The Order to Dismiss dismissed several theories of liability, including the entirety of Plaintiffs' MMWA claim, with leave to amend. (Id. at 13.) Plaintiffs did not file an amended complaint. On December 26, 2017, Defendants answered the Complaint. ("Answer," Dkt. No. 57.) On February 5, 2020, this matter was reassigned from Judge Guilford to this Court. (Dkt. No. 225.)

**B. Motions to Strike**

**1. Motion to Strike**
On June 3, 2019, Defendants filed a motion to strike the testimony of Dr. Robert Parker. (See MTS.) In support of the MTS, Defendants filed three exhibits ("MTS Exhibits 1–3," Dkt. Nos. 151-1–3) and a proposed order (Dkt. No.

151-4.) On July 8, 2019, Plaintiffs filed an opposition. ("MTS Opposition," Dkt. No. 175.) On July 22, 2020, Defendants replied. ("MTS Reply," Dkt. No. 189.) In support of the MTS Reply, Defendants filed the declaration of Michael B. Shortnacy ("Shortnacy MTS Declaration," Dkt. No. 189-1) and five exhibits ("MTS Exhibits 4–8," Dkt. Nos. 189-2–6).

### 2. Second Motion to Strike

On June 21, 2019, Defendants filed a motion to strike the testimony of Stefan Boedeker. (See 2d MTS.) In support of the 2d MTS, Defendants filed the declaration of Michael B. Shortnacy ("2d Shortnacy MTS Declaration," Dkt. No. 166-1), a copy of the Boedeker Report ("Boedeker Report," Dkt. No. 166-2), the rebuttal report of Dr. R. Wilcox ("Wilcox MTS Rebuttal 1–2," Dkt. Nos. 166-3–4), excerpts of the Boedeker Deposition ("Boedeker MTS Depo.," Dkt. No. 166-6), excerpts of the Dr. Wilcox Deposition ("Wilcox MTS Depo.," Dkt. No. 166-7), a copy of the expert report of Jason Arst ("Arst MTS Report," Dkt. No. 166-8), excerpts of the Dr. Parker Deposition ("Parker MTS Depo.," Dkt. No. 166-9), and a proposed order (Dkt. No. 166-10).

**\*2** On July 15, 2019, Plaintiffs opposed the 2d MTS. ("2d MTS Opposition," Dkt. No. 178.) In support of the 2d MTS Opposition, Plaintiffs filed an exhibit. ("MTS Exhibit A," Dkt. No. 178-1.)

On July 22, 2019, Defendants replied. ("2d MTS Reply," Dkt. No. 188.) In support of the 2d MTS Reply, Defendants filed the declaration of Livia Kiser ("Kiser MTS Declaration," Dkt. No. 188-1) and four exhibits ("Kiser MTS Exhibits 1–4," Dkt. Nos. 188-2–5).

On October 29, 2019, Judge Guilford requested supplemental briefing on multiple issues related to the 2d MTS and MSJ. (Dkt. No. 220.) On March 30, 2020, Defendants submitted a supplemental memorandum in support of the 2d MTS and MSJ. ("Supplemental Memo," Dkt. No. 230.) On April 6, 2020, Plaintiffs filed a supplemental opposition to the 2d MTS and MSJ. ("Supplemental Opposition," Dkt. No. 231.)

### C. Motion for Summary Judgment

On June 3, 2019, Defendants filed the MSJ. (See MSJ.) In support of the MSJ, Defendants filed a statement of undisputed facts and conclusions of law ("DSUF," Dkt. No. 152-1), the declaration of Livia M. Kiser ("Kiser MSJ Declaration," Dkt. No. 153), forty-four exhibits ("MSJ Exhibits 1–2," Dkt. No. 153-1; "MSJ Exhibits 3–4," Dkt. No. 153-3; "MSJ Exhibits 5–12," Dkt. No. 153-4; "MSJ Exhibits 13–22," Dkt. No. 153-5; "MSJ Exhibits 23–31," Dkt. No. 153-5; "MSJ Exhibits 32–44," Dkt. No. 153-6), and a proposed order (Dkt. No. 152-2).

On July 8, 2019, Plaintiffs opposed the MSJ. ("MSJ Opposition," Dkt. No. 174.) In support of the MSJ Opposition, Plaintiffs filed a statement of undisputed facts and conclusions of law ("PSUF," Dkt. No. 174-1), the declaration of Jeffrey Osterwise ("Osterwise MSJ Declaration," Dkt. No. 174-2), and thirty-eight exhibits ("MSJ Exhibits A–NN," Dkt. Nos. 174-3–40).

On July 22, 2019, Defendants replied. ("MSJ Reply," Dkt. No. 187.) In support of the MSJ Reply, Defendants filed two declarations from Michael B. Shortnacy ("Shortnacy MSJ Declaration," Dkt. No. 187-1; "2d Shortnacy MSJ Declaration," Dkt. No. 190-1), eleven exhibits ("MSJ Exhibits 45–50," Dkt. Nos. 187-2–7; "MSJ Exhibits 51–55," Dkt. Nos. 190-2–6), a reply to the PSUF ("Reply to PSUF," Dkt. No. 190), and a reply to Plaintiff's statement of additional facts ("2d Reply to PSUF," Dkt. No. 191).

### D. Motion for Class Certification

On May 13, 2019, Plaintiffs filed the MCC. (See MCC.) In support of the MCC, Plaintiffs filed the declaration of Gary E. Mason ("Mason Declaration," Dkt. No. 147-1), twelve exhibits ("MCC Exhibits A–L," Dkt. No. 147-2–13), and a proposed order (Dkt. No. 147-14). On June 21, 2019, Defendants opposed the MCC. ("MCC Opposition," Dkt. No. 167.) In support of the MCC Opposition, Defendants filed the declaration of Michael B. Shortnacy ("Shortnacy MCC Declaration," Dkt. No. 167-1) and forty-eight exhibits ("MCC Exhibits 1–48," Dkt. Nos. 167-2–6). On July 19, 2019, Plaintiffs replied. ("MCC Reply," Dkt. No. 186.) In support of the MCC Reply, Plaintiffs filed the declaration of Gary E. Mason ("2d Mason Declaration," Dkt. No. 186-1) and seven exhibits ("MCC Exhibits M–S," Dkt. Nos. 186-2–8).

## II. LEGAL STANDARD

### A. Rule 56

**\*3** Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying the portions of the pleadings and record that it believes

demonstrate the absence of an issue of material fact. See [Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)](). Where the non-moving party bears the burden of proof at trial, the moving party need not produce evidence negating or disproving every essential element of the non-moving party's case. [Id. at 325](). Instead, the moving party need only prove there is an absence of evidence to support the nonmoving party's case. Id.; [In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010)](). The moving party must show that "under the governing law, there can be but one reasonable conclusion as to the verdict." [Anderson, 477 U.S. at 250]().

If the moving party has sustained its burden, the non-moving party must then show that there is a genuine issue of material fact that must be resolved at trial. [Celotex, 477 U.S. at 324](). The non-moving party must make an affirmative showing on all matters placed at issue by the motion as to which it has the burden of proof at trial. [Celotex, 477 U.S. at 322](); [Anderson, 477 U.S. at 252](). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." [Anderson, 477 U.S. at 248](). "This burden is not a light one. The non-moving party must show more than the mere existence of a scintilla of evidence." [In re Oracle, 627 F.3d at 387]() (citing [Anderson, 477 U.S. at 252]()).

Critically, a trial court "may only consider admissible evidence when reviewing a motion for summary judgment." [Weil v. Citizens Telecom Servs. Co., LLC, 922 F.3d 993, 998 (9th Cir. 2019)]() (citing [Orr v. Bank of America, NT & SA, 285 F.3d 764, 773 (9th Cir. 2002)]()); see Fed. R. Civ. Proc. 56(e). At the summary judgment stage, district courts consider evidence with content that would be admissible at trial, even if the form of the evidence would not be admissible at trial. See [Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003)](); [Block v. City of Los Angeles, 253 F.3d 410, 418–19 (9th Cir. 2001)]().

When deciding a motion for summary judgment, the court construes the evidence in the light most favorable to the non-moving party. [Barlow v. Ground, 943 F.2d 1132, 1135 (9th Cir. 1991)](). Thus, summary judgment for the moving party is proper when a "rational trier of fact" would not be able to find for the non-moving party based on the record taken as a whole. [Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)]().

**B. Rule 23**

[Federal Rule of Civil Procedure 23]() ("[Rule 23]()") governs the litigation of class actions. A party seeking class certification must establish the following prerequisites:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

[Fed. R. Civ. P. 23(a)](). After satisfying the four prerequisites of numerosity, commonality, typicality, and adequacy, a party must also demonstrate one of the following: (1) a risk that separate actions would create incompatible standards of conduct for the defendant or prejudice individual class members not parties to the action; (2) the defendant has treated the members of the class as a class, making appropriate injunctive or declaratory relief with respect to the class as a whole; or (3) common questions of law or fact predominate over questions affecting individual members and that a class action is a superior method for fairly and efficiently adjudicating the action. See [Fed. R. Civ. P. 23(b)(1)–(3)](). [1]

**\*4** A trial court has broad discretion regarding whether to grant a motion for class certification. See [Bateman v. Am. Multi-Cinema, Inc., 623 F.3d 708, 712 (9th Cir. 2010)](). However, "[a] party seeking class certification must affirmatively demonstrate compliance with [ [Rule 23]()]— that is, the party must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." [Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011)](). A district court must conduct a "rigorous analysis" that frequently "will entail some

overlap with the merits of the plaintiff's underlying claim." Id. at 351. "Courts typically proceed claim-by-claim in determining whether the Rule 23 requirements have been met, particularly as to the Rule 23(a)(2) and (b)(3) requirements of common questions and predominance." Allen v. Verizon California, Inc., 2010 WL 11583099, at *2 (C.D. Cal. Aug. 12, 2010).

Rule 23 further provides that "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues," Fed. R. Civ. P. 23(c)(4), or the "class may be divided into subclasses that are each treated as a class under this rule," Fed. R. Civ. P. 23(c)(5). "This means that each subclass must independently meet the requirements of Rule 23 for the maintenance of a class action." Betts v. Reliable Collection Agency, Ltd., 659 F.2d 1000, 1005 (9th Cir. 1981).

### III. MOTIONS TO STRIKE

#### A. Motion to Strike

Defendants move the Court to strike the testimony of Plaintiffs' expert Dr. Robert Parker. (See MTS.) Because the Court need not rely on the testimony of Dr. Parker to resolve the Motions, the motion to strike is DENIED AS MOOT.

#### B. Second Motion to Strike [2]

Defendants also move the Court to strike the expert report of Stefan Boedeker. (See 2d MTS.) Boedeker serves as Plaintiffs' economic expert, offering opinions intended to substantiate Plaintiffs' theory of damages. Boedeker's opinion relies on a methodology known as "choice-based conjoint analysis." (Wilcox MTS Rebuttal 1 ¶ 14.) Choice-based conjoint analysis utilizes survey questions to ask respondents their willingness to purchase certain products and product attributes for certain prices. (Id.) Data is then collected and used to calculate respondents' preferences and valuations for the products and product attributes in the survey. (Id.) Choice-based conjoint analysis is designed to measure consumers' willingness to pay ("WTP") for a product and the particular attributes of a product. (Id. ¶ 15.) In economic terms, choice-based conjoint analysis attempts to objectively measure demand through the aggregation of subjective respondent preferences. (Id.) Plaintiffs rely on Boedeker's conjoint study to measure the difference in economic value — and thus the damages owed — between Defendants' vehicles with and without the alleged transmission defect giving rise to this action.

*5 Defendants take issue with the reliability and admissibility of Boedeker's conjoint study. In particular, Defendants argue that the analysis suffers from two major flaws that warrant striking the report in its entirety: (1) the study is unreliable because it only accounts for demand-side and not supply-side considerations; (2) the study is unreliable because it utilizes an invalid design that obtains mostly irrational results. (2d MTS at 8.) The Court agrees with Defendants and finds that Boedeker's testimony must be excluded.

**1. Lack of Adequate Supply-Side Considerations**
As Defendants point out, Boedeker's report contains several major methodological flaws that warrant its exclusion. First, Boedeker's study calculates an inflated measure of damages because it does not adequately account for supply-side considerations. As Defendants' economics expert Dr. Ronald Wilcox explains, choice-based conjoint analysis typically "utilize[s] only demand-side information and [is] independent of costs and the competitive structure of the industry." (Wilcox MTS Rebuttal 1 ¶ 16.) Dr. Wilcox explains that when a choice-based conjoint analysis fails to account for supply-side considerations, estimated damages are grossly overestimated because "WTP measures the [ ] dollar amount an individual is *willing to pay* for a given product or feature of a product... not... the market price that consumers *actually pay*." (Id. ¶ 17 (emphasis in original).) To illustrate his point, Dr. Wilcox offers a helpful — if slightly oversimplified — analogy:

> "Suppose a consumer is theoretically willing to pay $2.00 for a packet of ten pieces of spearmint chewing gum and goes to the store to purchase a packet. At the store, the packet of gum is available at a price of $1.00, so the consumer buys the packet. In this case, there is a $1.00 difference between the consumer's WTP and the price the consumer actually pays. Now suppose that the chewing gum manufacturer had an issue at its packaging plant, and the packet of gum actually contains only nine pieces of spearmint gum and one piece of strawberry-flavored gum, but the price is still $1.00. Suppose further that our hypothetical consumer does not like strawberry-flavored gum and therefore has a reduced WTP for this 'defective' packet of gum. Rather than $2.00, the consumer's WTP has

dropped to $1.50. The rational consumer, however, would still choose to buy the packet of gum at the price of $1.00, even if he or she was aware that the packet of gum contains one strawberry piece, because a WTP of $1.50 still exceeds the market price of $1.00. So long as the customer's WTP remains greater than or equal to a product's market price, the rational customer will purchase the product."

(Id. ¶ 18.) Put in the simplest terms, measuring damages solely through the lens of a consumer's WTP overestimates a consumer's damages because even if a consumer has a reduced WTP for a defective or undesirable product, the consumer does not suffer any loss if their reduced WTP remains greater than the actual cost of the product. The integration of accurate and realistic supply-side considerations — such as the actual price of a product — therefore plays a critical role in producing an accurate measure of damages in a choice-based conjoint analysis.

Plaintiffs do not dispute the necessity of integrating adequate supply-side data to obtain an accurate measure of damages. Indeed, Boedeker admits in his report that "[t]he [market] price is not the simple average of all consumers' willingness-to-pay. Rather, the [market] price depends on both supply and demand." (Boedeker Report ¶ 23.) To incorporate supply-side considerations into his study, Boedeker relied on two supply-side variables: (1) the number of Honda Odyssey vehicles sold to the proposed class members over the proposed class period; [3] and (2) price options used as survey choices, which Boedeker claims reflect actual price options for features available in real Honda vehicles. The Court finds that Boedeker's flawed formulation of the second variable renders his conjoint study unreliable.

 *6  The survey distributed by Boedeker offered respondents the choice of five "packages" of four vehicle features with assignable price values ranging from $500.00 to $2,500.00. (Boedeker Report ¶ 116, Figure 19; id. ¶ 117, Table Four.) Each respondent was tasked with choosing their preferred package of vehicle features, with each package assigned one of Boedeker's price values. (Boedeker Report ¶ 116, Figure 19.) Boedeker ultimately computed his WTP from an average of respondent preferences, with the price values he assigned to each package playing a critical role in measuring respondent preference. However, rather than assigning price values using the actual market price for features available in a 2011-2016 Honda Odyssey, Boedeker testified that he used the price of similar features in a 2019 Honda Odyssey as a baseline measurement of value and then exercised his "professional judgment" to choose five price values in increments of $500.00 to serve as his survey choices. (Boedeker MTS Depo. at 165:18-166:6.)

The issue with Boedeker's methodology, of course, is that while Boedeker is an expert in economics, he is certainly "not an expert in the valuation of automotive components." (Id. at 161:15-18.) By untethering his survey price choices from real-world prices, Boedeker's methodology sows doubt as to the reliability of his WTP calculation. Moreover, because at least one of the features offered to respondents as a survey choice was fabricated by Boedeker and has no real-world counterpart, it is unclear how Boedeker arrived at a relative valuation for that feature at all. (Id. at 162:17-22; 163:5-18.) Thus, Boedeker's price choices appear to be partially — and in one case wholly — premised on his speculative and arbitrary "judgment" of the value of those features.

Viewed alone, Boedeker's speculative valuation of prices in his survey choices is sufficient to strike his report. This is because, as the Ninth Circuit has held recently, an expert's "conjoint analysis [must] reflect market realities and prices for [the relevant] products." Zakaria v. Gerber Prod. Co., 755 F. App'x 623, 624 (9th Cir. 2018). Likewise, district courts across the country have excluded choice-based conjoint analyses that fail to accurately account for supply-side considerations. See, e.g., In re Gen. Motors LLC Ignition Switch Litig., 407 F. Supp. 3d 212, 237 (S.D.N.Y.), motion to certify appeal granted, reconsideration denied, 427 F. Supp. 3d 374 (S.D.N.Y. 2019) (excluding Boedeker's report because his "demand-side-only evidence...fails to estimate hypothetical market conditions"); Zakaria v. Gerber Prod. Co., 2017 WL 9512587, at *20 (C.D. Cal. Aug. 9, 2017), aff'd, 755 F. App'x 623 (9th Cir. 2018) ("Plaintiff has failed to show that the methodology employed by Howlett sufficiently accounted for the actual price of [the relevant product].... The conjoint analysis is [thus] not sufficiently tethered to actual market conditions, including pricing[.]"); In re NJOY, Inc. Consumer Class Action Litig., 2016 WL 787415, at *7 (C.D. Cal. Feb. 2, 2016) ("Because Dr. Harris's [ ] conjoint analysis... continue[s] to focus on a consumer's subjective valuation, and thus do not permit the court to calculate the *true market price* of N–JOY cigarettes absent the purported misrepresentations and omissions, [it warrants exclusion.]") (emphasis in original); Saavedra v. Eli Lilly & Co., 2014 WL 7338930, at *5 (C.D. Cal. Dec. 18, 2014) (excluding conjoint analysis because the expert's model "look[ed] only

to the demand side of the market equation... [and] convert[ed] the lost-expectation theory from an objective evaluation of relative fair market values to a seemingly subjective inquiry of what an average consumer wants[ ]"). The logic behind the exclusions of expert testimony in those cases is plain: without the integration of <u>accurate</u> supply-side considerations, a choice-based conjoint analysis transforms into a formula missing half of the equation.

To contest the lack of supply-side considerations in Boedeker's study, Plaintiffs submit a twenty-page declaration from Boedeker clarifying and elaborating on his original report. (See MTS Exhibit A.) But as Defendants accurately point out, Plaintiffs failed to timely disclose Boedeker's response to Wilcox's criticisms by the expert disclosure deadline. See Fed. R. Civ. P. 26(a)(2)(D)(ii) (requiring expert rebuttal reports to be disclosed within 30 days of the other party's disclosure unless a court orders otherwise); Fed. R. Civ. P. 37(c)(1) (instructing that a party that fails to disclose an expert report is "not allowed to use th[at] information... to supply evidence on a motion[ ]").[4] More importantly, even if the Court considered Boedeker's rebuttal report, the rebuttal report does not offer any explanation for the seemingly arbitrary nature of the price options utilized in his study. Thus, whether or not the Court considers the rebuttal report, Boedeker's initial report warrants exclusion.

### 2. Flawed Study Methodology

*7 Although Boedeker's arbitrary valuations are sufficient to strike his report, the report contains other significant methodological flaws that undermine its reliability. In addition to its inadequate and inaccurate accounting for supply-side considerations, Boedeker's report warrants exclusion for a separate and independent reason: Boedeker's conjoint study was conducted in a manner that undermines its reliability. Choice-based conjoint analyses typically utilize a pretest to ensure that questions on the final survey are not confusing, misleading, and accurately measure respondent preferences. (Wilcox MTS Rebuttal 1 ¶ 69.) However, as Dr. Wilcox points out in his deposition, Boedeker failed to conduct a valid pretest survey using the same instrument utilized in the final survey. (Wilcox MTS Depo. at 124:8-125:7.) Instead, for reasons Boedeker does not adequately explain, the final survey given to respondents fundamentally differed from the pretest. Specifically, Boedeker included thirty-two vehicle attributes and an "other" category as options for respondents to choose from in his pretest survey. (Boedeker Report ¶ 102, Figure 17.) In the final survey, Boedeker provided just <u>four</u> vehicle attributes. (Boedeker Report ¶ 107, Table Four.) This design choice undermines the reliability of Boedeker's report in three fundamental ways.

First, and most obviously, the purpose of a pretest survey is to test survey questions and choices and determine whether they are misleading, confusing, or suggestive. The value of a pretest survey is lost, however, when the pretest survey and final survey are substantially different. Indeed, Boedeker's responses reflect that twenty respondents — roughly four percent of Boedeker's sample — expressed confusion over Boedeker's survey questions. (Wilcox MTS Rebuttal 1 ¶ 34; MTS Exhibit A ¶ 53.) Furthermore, some respondents reported that they were not confused by the survey, but chose absurd or illogical responses that reflected a misunderstanding of the survey choices and instructions. (Wilcox MTS Rebuttal 1 ¶ 36–37.) As Dr. Wilcox explains, if Boedeker administered a proper pretest, he would likely have eliminated or at least narrowed the questions and choices that respondents found confusing. (Wilcox MTS Rebuttal 1 ¶ 69; <u>see also</u> Kiser MTS Exhibit 3, Wilcox Depo. at 123:4-24 ("In general, in the main conjoint survey, you will not see any comments [expressing confusion], because these are comments that individuals typically write in a pretest.").) Thus, Boedeker's failure to conduct a meaningful pretest survey casts doubt on the reliability of his survey responses.

Second, Boedeker's reduction of the amount of vehicle attributes in the final survey from thirty-three to four fails to mirror real-world considerations and skews respondent preferences. Consumers in the real-world automobile market are routinely confronted with a plethora of different options and features in a vehicle, each of which affects the consumer's perception of relative value. The more limited a consumer's choice of vehicle features, the more artificially inflated the importance of the remaining features and the greater the risk that a consumer's perception of value is skewed. The risk of inflating a feature's value is particularly high when the other features in a survey are ranked as less important by respondents. For that very reason, even Boedeker recognizes in his report that "choice of attributes... is an important aspect of proper conjoint study design." (Boedeker Report ¶ 54.)

Despite that acknowledgment, for reasons unexplained, Boedeker selected just four features for respondents to choose from in his final survey. Moreover, only one of those features was ranked by pretest respondents as being an important feature: the attributes included in the final survey by Boedeker

were ranked as the eighth, sixth, and second most valued features by pretest respondents, while more preferred features like rearview cameras, trunk space, and four-wheel drive were excluded.[5] (Boedeker Report ¶ 104, Figure 18.) As Dr. Wilcox explains, "[s]uch an exclusion of important attributes artificially inflates the relative importance of the lesser valued attributes included in Mr. Boedeker's conjoint survey[,]" and risks overestimating respondents' WTP for a functioning transmission. (Wilcox MTS Rebuttal 1 ¶ 48.)

**\*8** Finally, Boedeker's failure to properly pretest his survey appears to have tainted his results. Dr. Wilcox analyzed individual survey responses in Boedeker's study and found that a remarkable 55.4% of individual responses reflected economically irrational choices as to either price levels, the presence of defects, or both. (Wilcox MTS Rebuttal 1 ¶¶ 13, 33.) For example, Boedeker used a software known as Sawtooth to estimate and extrapolate respondent preferences for packages of vehicle features not shown to them in the final survey. (MTS Exhibit A ¶ 63.) Sawtooth calculated that one respondent's choices indicated a willingness to pay three million dollars more for a vehicle with a defect than for a vehicle without the alleged transmission defect. (Wilcox MTS Rebuttal 1 ¶ 30.) In the case of another respondent, Sawtooth calculated a willingness to pay ten million dollars more for a vehicle without the alleged transmission defect than a vehicle with the alleged transmission defect.[6] (Id.) Altogether, the irrationality exhibited in individual survey responses evidences a deeply flawed conjoint study that produced unreliable results unreflective of actual WTP.

Plaintiffs contend that the irrational survey responses only appear when survey responses are viewed individually and that Boedeker found the responses statistically reliable when averaged. (MTS Opposition at 19.) Plaintiffs apparently argue that because Boedeker's composite average of respondent valuations is reliable, Dr. Wilcox's analysis of individual responses should be disregarded. Plaintiffs fail to explain, however, how Boedeker's average of responses can be reliable if the majority of individual responses constituting his average are irrational and unreliable.

To illustrate the Court's point, it takes a page from Boedeker and Dr. Wilcox and draws the following hypothetical. An arborist seeks to measure the typical height of trees in a nearby forest. The forest consists of just two types of trees in equal amounts: towering redwood trees three hundred feet in height, and diminutive saplings just a few inches above the ground. When calculated, the average height of trees in the forest is approximately 150 feet. If the arborist used the average height of trees to represent the height of trees in the forest, the average height would not reflect reality, because no tree in the forest measures 150 feet tall. Instead, only assessing the individual height of trees underlying the average would reveal an accurate impression of the height of trees in the forest. Likewise, Boedeker's average of responses gives an inaccurate impression of respondents' WTP because most of the underlying individual responses vary dramatically from the calculated average.

The case cited by Plaintiffs in support of their argument is not to the contrary. (MTS Opposition at 19 (citing In re Myford Touch Consumer Litig., 2016 WL 7734558, at \*17 (N.D. Cal. Sept. 14, 2016) (hereinafter "Myford").) In Myford, the district court merely held that Boedeker's use of averages in calculating class-wide damages was permissible where "individual records [of damages] do not exist," id. at \*18, a conclusion the Court takes no issue with. Myford did not address an issue like the one here, where the data underlying an average makes the average provenly unreliable.

While Myford is inapposite, Judge William Alsup's opinion in Oracle Am., Inc. v. Google Inc., 2012 WL 850705, at \*10–11 (N.D. Cal. Mar. 13, 2012) (hereinafter "Oracle") is directly on point. In Oracle, Judge Alsup considered whether an expert's market share calculation utilizing conjoint survey results to measure WTP for various cell phone features was reliable. Oracle, 2012 WL 850705, at \*10. Judge Alsup noted that a pretest focus-group of respondents was presented with thirty-nine features to choose from, while the final survey offered respondents just seven cell phone features. Id. He observed that "[i]t is highly likely that study participants would have placed greater importance on [one feature] if it were shown with six other features as opposed to 38 other features.... In the real world, a consumer is faced with many features when making a decision to purchase, not artificially focused on a particular feature." Id. Judge Alsup further reasoned that the artificial inflation of value caused by offering respondents fewer features was "exacerbated by the fact that important product features[ ]... were purposely left out [the final survey] and replaced with an arguably unimportant feature[.]" Id. Finally, Judge Alsup pointed out that the design flaws in the conjoint survey produced intolerably irrational results: 25% of respondents preferred or were statistically indifferent between a smartphone costing $200.00 to a theoretically identical smartphone costing

$100.00. Id. at *11. Oracle held, just as the Court does here, that the flawed methodology utilized in the conjoint survey led to an unreliable expert report that warranted exclusion. Id.

**\*9** Plaintiffs contend that the flaws in Boedeker's report are best weighed by a jury, not the Court. But it is eminently the role of courts applying FRE 702 to determine the validity of expert testimony and act as "gatekeep[ers]" to prevent unreliable information from ever reaching the jury. See Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc., 618 F.3d 1025, 1035 (9th Cir. 2010). To properly maintain that role, "district courts [must] ensure that any and all scientific testimony — including testimony based on technical[ ] or other specialized knowledge — is not only relevant, but reliable." Id. (internal quotations omitted) (citing Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147 (1999)).) The judiciary's role as gatekeeper under Daubert reflects "the [jury's] difficulty in evaluating [expert testimony,]" Daubert, 509 U.S. at 589, and the "aura of authority experts often exude... [that] lead[s] juries to give [disproportional] weight to their testimony[.]" In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prod. Liab. Litig., 978 F. Supp. 2d 1053, 1064 (C.D. Cal. 2013).

To be sure, mere "technical inadequacies" in the administration of an expert's survey or disputes over the adequacy of an expert's credentials typically bear only on the weight of an expert's report, not its admissibility. Fortune Dynamic, 618 F.3d at 1036 (9th Cir. 2010). For that very reason, the Court does not consider Defendants' contentions that focalism bias in the survey questions, demographical disparities amongst survey respondents, and the insufficiency of Boedeker's credentials warrant striking Boedeker's report.

But where, as here, the reliability and relevance of an expert's study is called into question because its underlying methodology or its reasoning fails to comport with "accepted principles" in that expert's community, the Court has a responsibility to exclude the opinion altogether. Id.; see also Estate of Barabin v. AstenJohnson, Inc., 740 F.3d 457, 463 (9th Cir. 2014) (holding that the 702 inquiry is "concerned not [with] the correctness of the expert's conclusions but the soundness of his methodology.") (internal quotations omitted); Ollier v. Sweetwater Union High Sch. Dist.,

768 F.3d 843, 860 (9th Cir. 2014) ("[Daubert] requires district courts, acting in a gatekeeping role, to assess whether the reasoning or methodology underlying the testimony is valid[.]") (internal quotations omitted). Because Boedeker's underlying methodology renders his report unreliable, the Court GRANTS the 2d MTS and STRIKES the Boedeker Report.

## IV. MOTION FOR SUMMARY JUDGMENT

Defendants move the Court to enter summary judgment on all twelve of Plaintiffs' claims. (See MSJ.) Defendants have pointed to an absence of evidence of damages from the alleged transmission defect, a required element of each of Plaintiffs' claims; Plaintiffs thus bear the burden of production to establish damages as a result of Defendants' alleged conduct. [7] In re Brazier Forest Prod., Inc., 921 F.2d 221, 223 (9th Cir. 1990) ("[I]f the nonmoving party bears the burden of proof on an issue at trial, the moving party need not produce affirmative evidence of an absence of fact to satisfy its burden. The moving party may simply point to the absence of evidence to support the nonmoving party's case. The nonmoving party must then make a sufficient showing to establish the existence of all elements essential to their case on which they will bear the burden of proof at trial.") (internal citations omitted) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). Because Plaintiffs' sole evidence of damages is the stricken testimony of Boedeker, the Court finds no triable issue of fact as to damages. [8] The Court thus GRANTS the MSJ and DISMISSES the Complaint WITH PREJUDICE. The MCC is DENIED AS MOOT.

## V. CONCLUSION

**\*10** For the reasons described above, the Court GRANTS the 2d MTS, GRANTS the MSJ, and DISMISSES the Complaint WITH PREJUDICE. The MCC and MTS are DENIED AS MOOT. A separate judgment shall issue in favor of Defendants. The Clerk is directed to close the case.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2020 WL 5583534

## Footnotes

1     While some circuits have adopted an "ascertainability" prerequisite to certification, the Ninth Circuit has not. [Briseno v. ConAgra Foods, Inc., 844 F.3d 1121, 1124 n.4 (9th Cir. 2017)](#) ("ConAgra cites no other precedent to support the notion that our court has adopted an 'ascertainability' requirement. This is not surprising because we have not. Instead, we have addressed the types of alleged definitional deficiencies other courts have referred to as 'ascertainability' issues ... through analysis of [Rule 23](#)'s enumerated requirements.").

2     Plaintiffs assert that the 2d MTS should be denied because Defendants failed to meet and confer with them pursuant to Local Rule 7-3 prior to filing. (2d MTS Opposition at 8.) Because Plaintiffs fail to identify any prejudice from Defendants' failure to meet and confer, the Court considers the merits of the 2d MTS. [Wilson-Condon v. Allstate Indem. Co., 2011 WL 3439272, at *1 (C.D. Cal. Aug. 4, 2011)](#) ("[Defendant] does not appear to have suffered any prejudice from Plaintiff's failure to meet and confer sufficiently in advance, and [Defendant] was able to prepare and submit an opposition. Thus, it appears that no prejudice will result if the Court considers the motion...on the merits notwithstanding Plaintiff's failure to comply with Local Rule 7–3."). The Court warns Defendants that failure to comply with the Local Rules in the future could result in sanctions.

3     Boedeker multiplied the number of Honda Odyssey vehicles sold to the proposed class by respondents' WTP in order to calculate damages. While the parties engage in extensive debate over whether such backwards-looking sales data can ever be used to accurately integrate supply-side considerations, the Court need not opine on the propriety of Boedeker's use of sales data to resolve the Motions.

4     [Rule 37](#) permits untimely disclosures of expert testimony to serve as evidence if the "failure [to disclose] was substantially justified or is harmless." [Fed. R. Civ. P. 37(c)(1)](#). Plaintiffs have not met their burden to establish either harmlessness or a substantial justification. See [Yeti by Molly, Ltd. v. Deckers Outdoor Corp., 259 F.3d 1101, 1107 (9th Cir. 2001)](#) ("Implicit in [Rule 37(c)(1)](#) is that the burden is on the party facing [exclusion of evidence] to prove harmlessness [or substantial justification].").

5     Worse yet, the most preferred feature included in the final survey was a fictitious fuel injection system fabricated by Boedeker for use in the study and with no real-world counterpart. (Boedeker Report ¶ 104; see also Wilcox MTS Rebuttal 1 ¶ 43 ("[A] conjoint survey that does not reflect [the] actual marketplace [ ] can lead to unreliable and biased results").)

6     For comparison, Dr. Wilcox points out that the retail price for a new 2016 Honda Odyssey is approximately $29,550.00. (Wilcox MTS Rebuttal 1 ¶ 30 n.37.)

7     Plaintiffs argue that Defendants waived the issue of damages because they failed to raise it in the original briefing for the MSJ. (Supplemental Opposition at 13.) Not so. Plaintiffs had ample notice that Defendants sought summary judgment on the issue of damages: first, at the hearing on the Motions held on August 12, 2019 (see Dkt. No. 216) and then again when Judge Guilford permitted supplemental briefing on "how the motion to strike Mr. Boedeker's testimony impacts whether and to what extent summary judgment should be granted in this case." (Dkt. No. 220.) Because Plaintiffs had notice of Defendants' argument and ample opportunity to rebut it with alternative evidence of damages, the Court exercises its discretion to consider the argument. See [Bernstein v. Virgin Am., Inc., 365 F. Supp. 3d 980, 985 (N.D. Cal. 2019)](#) ("[A]pplication of th[e] waiver or forfeiture doctrine is discretionary, both on appeal and with the district court.") (citing [Novato Fire Prot. Dist. v. United States, 181 F.3d 1135, 1142 n.6 (9th Cir. 1999)](#)).

8     In an effort to survive summary judgment, Plaintiffs contend that evidence of the cost to repair their vehicles as a result of the alleged transmission defect suffices to prove damages. (Supplemental Opposition at 15.) In support of that argument, Plaintiffs cite generally to a thirty-page document purporting to depict Defendants' internal analysis of the cost of repairing the alleged transmission defect. (See Dkt. No. 182-18.) Assuming without deciding that Plaintiffs' theory of damages is valid under the law of each state implicated in this matter,

documents depicting Defendants' internal assessment of the cost to repair class vehicles is not material evidence of the price paid by Plaintiffs to actually repair the alleged defect.

**End of Document**  © 2021 Thomson Reuters. No claim to original U.S. Government Works.